**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSHUA RICHTER,
            *Petitioner-Appellant,*

            v.

R. Q. HICKMAN, Warden; CAL A.
TERHUNE; ERNIE ROE,
            *Respondents-Appellees.*

No. 06-15614

D.C. No.
CV-01-00643-JKS

OPINION

Appeal from the United States District Court
for the Eastern District of California
James K. Singleton, Senior District Judge, Presiding

Argued and Submitted
December 17, 2008—Pasadena, California

Filed August 10, 2009

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
Barry G. Silverman, Kim McLane Wardlaw,
Raymond C. Fisher, Richard A. Paez, Jay S. Bybee,
Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Bybee

## COUNSEL

Cliff Gardner, Oakland, California, for petitioner-appellant Joshua Richter.

Harry Joseph Colombo, Deputy Attorney General, John G. McLean, Supervising Deputy Attorney General, and Mark Anthony Johnson, Deputy Attorney General, Sacramento, California, for the respondents-appellees.

## OPINION

REINHARDT, Circuit Judge:

> To . . . not prepare is the greatest of crimes; to be prepared
> beforehand for any contingency is the greatest of virtues.
>
> — Sun Tzu, *The Art of War* 83
> (Samuel B. Griffith trans., Oxford University Press 1963)

At the heart of an effective defense is an adequate investigation. Without sufficient investigation, a defense attorney, no matter how intelligent or persuasive in court, renders deficient performance and jeopardizes his client's defense.

Here, counsel did not meet his basic obligation to his client. Much was riding on his performance in this case: his client, Joshua Richter, was accused of murder, among other charges, and faced life imprisonment without parole. Yet, counsel failed to undertake the most elementary task that a responsible defense attorney would perform in a case of this nature, and consequently provided representation that fell well below a reasonable standard of professional competence. Although it was apparent that an issue critical to the outcome could best be resolved through the presentation of forensic evidence, counsel failed at each stage of the case to consult with a forensic expert of any type and thus failed to conduct the rudimentary investigation necessary in order to (1) decide upon the nature of the defense to be presented, (2) determine before trial what evidence he should offer, (3) prepare in advance how to counter damaging expert testimony that might be introduced by the prosecution, and (4) effectively cross-examine and rebut the prosecution's expert witnesses once they did testify during the course of the trial. There was in fact no strategic reason for counsel's failure to do so. As it turned out, these repeated failures to investigate were prejudicial: available forensic testimony would have contradicted the prosecution's explanation of the events that transpired and would have strongly supported the defense's version.

We conclude that, singly and collectively, counsel's failures rise to the level of ineffective assistance of counsel under the Sixth Amendment. There is nothing novel about our holding. Rather, we arrive at the only reasonable conclusion that can be reached, given the facts of the case and the well-established applicable law. We therefore reverse the district court and remand with directions to grant the writ of habeas corpus.

## I.

On December 18, 1995, a California jury convicted Joshua Richter ("Richter") and Christian Branscombe ("Branscombe") of the murder of Patrick Klein ("Klein") and attempted murder of Joshua "Gunner" Johnson ("Johnson"), as well as of burglary and robbery. Both young men were sentenced to life in prison without the possibility of parole. Richter and Branscombe were each twenty at the time of the offense and twenty-one years old at the time of conviction.

Almost precisely a year prior to the date of their conviction, on the evening of December 19, 1994, Richter and Branscombe drove to the Sacramento home of Johnson, a close friend of Richter's and an acquaintance of Branscombe's. The two young men had earlier completed their final day of work at a nearby Christmas tree lot, and Richter's boss had paid him approximately $800 in cash. He had also given him the wages owed to Johnson's housemate, Tony,[1] a friend and co-worker who had failed to show up for work that day. Richter and Branscombe drove to Johnson's house so that Richter could pay Johnson some money he owed him out of his newly received earnings, deliver Tony's wages, and buy some "head stash" from Johnson, who was a major marijuana dealer.

When Richter and Branscombe arrived at the house, no one was home. They waited in the driveway, in Richter's girl-

---

[1]The record reflects uncertainty regarding Tony's last name.

friend's car, until Johnson returned shortly thereafter, accompanied by Klein and another friend. Johnson did not immediately recognize Richter's girlfriend's car, and approached it with his .380 caliber M-12 handgun loaded and drawn. Upon seeing the defendants, Johnson put the weapon away. Johnson, Klein, Richter, and Branscombe went into the house, where they socialized for several hours. While they talked and Johnson, Klein, and Richter smoked marijuana, Branscombe cleaned a .32 caliber handgun that he had recently acquired from Johnson as a means of protection when he worked late nights at the tree lot. Richter and Branscombe left Johnson's residence shortly after 2:30 a.m. Klein decided to spend the night.

At trial, Richter and the State of California ("the State") presented dramatically different accounts of the ensuing events. According to the State, after Richter and Branscombe left, Johnson went to sleep in his bedroom and Klein lay down on the couch in the living room. Johnson awoke somewhere between 4:00 and 5:00 in the morning to find Richter and Branscombe in his bedroom, in the act of stealing his gun-safe, which he said was located in his bedroom closet. Branscombe then twice shot Johnson, who fell back wounded onto the bed. Soon thereafter, Johnson heard gunshots coming from the living room. After Richter and Branscombe left the house, Johnson got out of bed, found Klein lying on the living room couch bleeding, and discovered that his gun-safe, his .380 caliber M-12, and a hip sack that contained $6000 in cash were all missing.

Richter told a markedly different story. He testified that after leaving Johnson's house around 2:30, he and Branscombe decided to go back to the Christmas tree lot where they had worked. Their boss had instructed them to clear out their belongings from the trailer on the property before morning, and, not wanting to go to sleep for a few hours only to wake up early to finish the job, he and Branscombe got his pick-up truck and cleared out the trailer, including the belong-

ings of Johnson's housemate, Tony. The two young men then returned to Johnson's residence around 4:30 a.m., in order to see whether Tony had come home and to drop off his belongings, along with his pay. Branscombe also intended to return the .32 caliber handgun to Johnson if he was still awake. Richter stayed in his truck in Johnson's driveway, smoking a cigarette, while Branscombe knocked on the door and was let into the house by Klein.

Shortly thereafter, Richter heard gunshots. He headed toward the house and heard yelling and more gunshots as he approached the front door. He found Klein lying in the doorway to Johnson's bedroom, saw Johnson lying twisted on the bed, and found Branscombe "totally freaked out," standing in the middle of the bedroom holding a firearm, and shouting, "They tried to kill me." According to the defense, Johnson, who had earlier been drinking and smoking marijuana, had drawn his .380 caliber M-12 and fired at Branscombe when he entered the room. After firing one bullet, the gun — which Johnson had attempted to modify from a semi-automatic to a fully automatic — jammed, and Johnson threw it down. He then took out a second handgun — apparently a .22 caliber — that he kept under his mattress and shot at Branscombe, but hit Klein instead. Branscombe then fired three shots with the .32 caliber handgun and hit both Klein and Johnson.[2] After Richter arrived inside the house, Branscombe picked up Johnson's M-12 from the floor and ran outside to try to start the truck. Richter panicked and ran back out to the truck as well, and the two young men drove away.

---

[2]The dissent suggests the defense theory rested on the unlikely scenario that Klein attacked Branscombe "immediately" after letting him into the house. *See* Dissent at 10721, 10754-55. This is incorrect. The defense theory was that *Johnson* (not Klein) initiated the attack from inside the bedroom when Branscombe approached the bedroom door — which is not implausible if Johnson, a major drug dealer, impaired by drugs and alcohol, was startled awake and saw a figure he did not recognize in his bedroom doorway, especially given his demonstrated willingness to use his M-12 earlier in the evening.

Sometime after the shootings, Johnson made a 911 call to the police.[3] Johnson testified that, before the police arrived six minutes later, he made a phone call to his girlfriend's father and took two trips through the house and into the yard to hide his marijuana plants. When the police arrived, they encountered a "hysterical" Johnson, who had blood on his cheeks, shirt, hands and right shoulder. The police found Klein lying on top of a sleeping bag on the living room couch, near death.

The initial investigation of the scene uncovered two spent .32 casings in the bedroom, as well as blood on the bed where Johnson said he had been shot. There was a large pool of blood in the doorway to Johnson's bedroom, where Richter testified that Klein had been shot. The pool had been disturbed by a foot stomp or some other external force. Investigators determined that Klein had been shot twice, by a .22 and a .32 caliber bullet. They found a spent .32 and a spent .22 casing in the living room near the couch where Klein was lying, although the prosecution's expert testified at trial that it is impossible to determine with certainty how casings end up where they do.

A significant amount of blood was found throughout the house. Investigators photographed and videotaped the scene, collected a few blood swabs, and took some fingerprints, but primarily determined that the scene appeared to be consistent with Johnson's account of what had happened and did not pursue an in-depth forensic investigation. The police took a sample of blood from the door molding above the pool of blood in the doorway, but not from the pool itself. They did not perform any blood typing or blood spatter analysis and did not attempt to discover whose blood formed the pool in the doorway until the middle of the trial, nearly a year later, in the belief that the case was sufficient without such evidence.

---

[3]The defense contended that Johnson delayed for approximately half an hour before calling the police — time enough to manipulate the evidence at the scene and hide the .22 caliber firearm.

Richter testified that, upon fleeing the scene in a panic, he stopped briefly at his girlfriend's house, while Branscombe waited outside in the truck, and after a conversation about Johnson and Klein drove back to Johnson's house to check on his friends. He and Branscombe saw two sheriff's cars in the driveway, however, and decided not to stop. Instead, they drove out to a remote area, the Yolo bypass, where Richter, Branscombe, Johnson, and their friends frequently went to hang out and shoot their guns. There, they threw away the .380- and .32-caliber weapons and discussed what to do next. They slept for awhile. When they awakened, they discovered that their truck was stuck in the mud, and after obtaining assistance to get it moving, they eventually returned to town and were arrested shortly thereafter, a day and a half after the shooting.

Following his arrest, Richter, his attorney, and a police detective went out to the Yolo bypass in an attempt to recover the discarded weapons. They could not locate the firearms, but did find a $100 bill in the vicinity. Later, Richter's lawyer returned to a nearby area and managed to recover the .380 M-12, which he then turned over to the police. Investigators also found a spent .380 casing in Richter's truck which they determined had been ejected from Johnson's M-12. Richter testified that, driving to the Yolo bypass, Branscombe had dislodged a shell that had been jammed in the receiver by jerking on the lever. The weapons used to kill Klein and injure Johnson were never found.

In the aftermath of the shooting, Johnson told the police that his missing gun-safe would be at Richter's house. Sure enough, while searching Richter's residence, investigators found Johnson's gun-safe lying on a pile of assorted items in Richter's garage. According to the defense, the safe had been at Richter's house with Johnson's permission all along; Johnson frequently stored some of his belongings, including scuba gear and firearms, with Richter. Johnson admitted that he had stored the safe at Richter's residence but stated that he and a

friend had moved it to Johnson's house a couple of weeks before the shooting. Although Richter denied owning a handgun, investigators also found .22 caliber cartridges and a loaded magazine in Richter's garage. The cartridges were consistent with the .22 caliber bullet found in Klein's body, as well as with the casing found in Johnson's living room. In closing argument, Richter's lawyer argued that the cartridges were Johnson's, and that Johnson was storing the cartridges there along with the rest of his belongings.

Johnson owned a number of firearms, including two AK-47 assault rifles and a .22 caliber shotgun. Neither Richter nor Johnson admitted to owning a .22 caliber handgun, and Richter denied owning any handguns at all. He testified at trial, however, that Johnson owned, and had previously shown him, a .22 caliber pistol.

After the trial began, the State conducted two significant forensic tests that it had not previously performed and presented related testimony at trial. First, the State asked Detective Robert Bell to perform a blood spatter analysis of the crime scene, based on photographs that had been taken shortly after the shootings. Bell testified as an expert in blood spatter that it was unlikely that Klein could have been killed in the doorway and carried to the couch, primarily because of blood flow patterns on his head and the lack of smearing around the blood pool.[4] This suggested that Johnson would have had to have lifted Klein straight up. Bell acknowledged, however, that although there was some evidence of high velocity blood spatter near the couch, suggesting a shooting in that location,

---

[4]The State's blood spatter expert drew his conclusions from an analysis of photographs, nearly a year after the events in question. He explained, "I did not see the victim. He was transported prior to my arrival, and all I have had is these photos which are lacking. I mean, they are dark and not clear, but I was not able to see in viewing the photos anything consistent with [Klein falling to the floor] after having been asked to look at them." In analyzing the blood flow patterns on Klein's face, Bell admittedly could not see the right side of Klein's head.

there was no visible blood spatter on the sleeping bag or on the couch itself, and no blood spatter that corresponded with two shots being fired. Second, the State asked Jill Spriggs, a serologist, to determine the blood type of a sample collected from spatter four inches above the pool of blood in the bedroom doorway, and to compare that sample to Johnson's and Klein's blood. Spriggs testified, based on the PGM subtyping of the samples, that none of the blood was Klein's. The defense offered no expert testimony in response.

After a trial lasting over three weeks, a California Superior Court jury found Richter and Branscombe guilty of all charges. Following their convictions, Richter and Branscombe appealed to the California Court of Appeal, which affirmed the judgments of the trial court. Richter and Branscombe next filed a petition for review in the California Supreme Court, which was summarily denied, and then sought writs of habeas corpus in the California Supreme Court, which were also summarily denied. Richter and Branscombe timely petitioned for writs of habeas corpus in the United States District Court for the Eastern District of California, which rejected the petitions. They then sought certificates of appealability from this court, which we granted. A panel of our court affirmed the district court's denial of Richter's petition. We now sit en banc to rehear the appeal, having granted his petition for rehearing en banc.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law "if the state court

. . . arrives at a conclusion opposite to that [of the Supreme Court] on a question of law," or decides the case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application of" clearly established federal law "if the state court identifie[d] the correct governing legal rule . . . but unreasonably applie[d] it to the facts" at hand. *Id.* at 407. For a state court decision to be an unreasonable application of "clearly established Federal law" under § 2254(d)(1), the Supreme Court's prior decisions must provide a "governing legal principle or principles" applicable to the issue before the state court. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Circuit precedent is relevant under AEDPA when it illuminates whether a state court unreasonably applied a general legal standard announced by the Supreme Court. *See Crater v. Galaza*, 491 F.3d 1119, 1126 n.8 (9th Cir. 2007).

When reviewing a state court's summary denial of a habeas petition, we "look through" the summary disposition to the last reasoned state court decision. *Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006). Where, as here, no state court has explained its reasoning on a particular claim, we conduct an "independent review of the record to determine whether the state court's decision was objectively unreasonable." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).[5] We review a district court's decision to grant or deny a writ of habeas corpus de novo, *Lewis v. Mayle*, 391

---

[5]Here, the California Supreme Court denied Richter's habeas petition in one sentence, without providing any reasoning for its decision. No other state court commented on Richter's claim that counsel provided ineffective assistance by failing to investigate the source of the pool of blood, consult expert witnesses, or call any such witnesses who could testify as to its source.

Because we would grant the writ whether we reviewed the state court's decision de novo or for objective unreasonableness, we apply the stricter unreasonableness standard. Thus, we need not determine whether or when an unreasoned state court decision warrants AEDPA deference.

F.3d 989, 995 (9th Cir. 2004), and the district court's findings of fact for clear error, *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir. 1995).

As we conduct our independent review of the record, we apply the Supreme Court law on ineffective assistance of counsel claims — in particular, that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984); *see also id.* at 688 ("More specific guidelines are not appropriate. The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective . . . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). Under AEDPA, we apply *Strickland* to each individual case, irrespective of whether the precise fact pattern at issue has been considered previously by the Supreme Court. *See Williams*, 529 U.S. at 391 ("That the *Strickland* test 'of necessity requires a case-by-case examination of the evidence' . . . obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court.")."[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)). We do not, however, afford the state courts a blank check to determine, at their whim, whether an attorney's conduct was reasonable or unreasonable:

> That the standard is stated in general terms does not mean the application was reasonable. AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was

> announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

*Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007) (citations and internal quotation marks omitted). Where counsel's failure to investigate was both objectively unreasonable and prejudicial, and where the state court acted unreasonably in finding to the contrary, we will grant a petition for habeas corpus.

## III.

Richter challenges his conviction primarily on the ground that he received ineffective assistance of counsel and thus was deprived of his rights under the Sixth Amendment. *Strickland* sets forth the well-established two-part standard for ineffective assistance of counsel claims. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. To be "deficient," counsel's performance at trial must be objectively unreasonable — it must be "outside the wide range of professionally competent assistance." *Id.* at 688, 690. We "evaluate the conduct from counsel's perspective at the time" to "eliminate the distorting effects of hindsight," and we are "highly deferential" in judging counsel's performance, affording counsel a strong presumption of adequacy. *Id.* at 689.

Next, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. We find prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is clear . . . that [Richter] *need not* show that [counsel's] deficient conduct more likely than not altered the outcome in the case. This 'preponderance' standard was explicitly rejected in *Strickland*." *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir.

1994) (citing *Strickland*, 466 U.S. at 693) (emphasis in original).

Finally, because AEDPA applies, if we determine that the defendant did not receive effective assistance of counsel, we must decide whether the state court's decision that he did constitutes an unreasonable application of clearly established Supreme Court law. 28 U.S.C. § 2254(d).

Richter contends that his counsel rendered ineffective assistance under *Strickland* by (1) failing to investigate and present expert testimony on blood spatter, serology, and pathology in order to explain the source of the pool of blood by the doorway; (2) failing to investigate the accessibility of the floorboard that the state investigator dropped into the crawl space below the house, and to present expert ballistics testimony that the bullet hole was made by a .380-caliber, rather than a .22-caliber, bullet; (3) failing to investigate and present expert testimony on ballistics to show that Johnson's .380 M-12 might have jammed; and (4) failing to investigate and present testimony from lay witnesses. On state and federal habeas review, Richter submitted declarations from experts in blood spatter, serology, pathology, and ballistics, as well as from lay witnesses, to support his ineffective assistance claim.

We consider here only Richter's first argument — counsel's failure to investigate and present expert testimony on blood evidence — and conclude that he is correct. Even affording counsel the "strong presumption that [his] conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, we hold that there was no reasonable basis for his failure, before deciding on the nature of his defense, as well as while preparing for trial and during its course, to investigate the availability of forensic evidence that might corroborate Richter's testimony regarding the source of the pool of blood by the bedroom doorway. We so conclude, fully aware, as counsel should have been, that establishing the source, or at the least raising substantial

doubts as to the prosecution's evidence on that point, was critical to the success of Richter's defense. Finally, we conclude that Richter was prejudiced by counsel's deficient representation in this respect, and thus did not receive effective assistance of counsel. The state court holding to the contrary constitutes an objectively unreasonable application of *Strickland*. We therefore reverse the district court's denial of the writ of habeas corpus.

## A.   Deficient Performance

As we have explained, a central dispute between the prosecution and the defense was Klein's location when he was shot. Investigation of the crime scene revealed a pool of blood in the doorway between the bedroom and the living room. The State claimed that Klein was shot as he lay on the couch in the living room and that the pool of blood in the doorway was Johnson's: that the pool formed as Johnson stood, dripping blood on the floor, waiting for the police to arrive. Richter, however, although acknowledging that some of the blood might have been Johnson's, insisted that it was at least partly Klein's, as Klein had been shot near the doorway in a shootout and not in cold blood on the couch. This factual dispute was, indeed, the single most critical issue in the case, at least from the standpoint of the defense.[6] If the jury was persuaded beyond a reasonable doubt that Klein was killed on the couch,

---

[6]Although later stating that the defense's "entire case" depended on the plausibility of Johnson shooting at Branscombe during a struggle, Dissent at 10752, the dissent takes issue with our conclusion that the dispute over Klein's location when shot was the most important issue for the defense. *See* Dissent at 10710-11. We must disagree; there can be no doubt of its importance to Richter's account of self-defense. Blood evidence, which obviously might prove or disprove the location of the shooting, was therefore critical. That the State, which was unaware of Richter's version of the events before trial began, did not immediately understand the significance of the pool of blood in the bedroom doorway has no bearing upon the relative importance of the source of the pool to the defense's theory of the case.

the defense would have no hope of succeeding. If, however, the jury believed that there was a reasonable possibility that Klein had been shot in the doorway, as Richter testified, Johnson's version of the events — and the prosecution's case — would be severely undermined, and the shootout version offered by the defense would in all likelihood preclude a verdict of guilty. Under the circumstances, any competent defense counsel would have immediately recognized the critical importance of investigating the source of the pool of blood, and of attempting to obtain forensic evidence that would support Richter's account of the fatal evening's occurrences. In fact, knowing that forensic evidence could provide support for either version of the events, and could corroborate or discredit his client's account, competent counsel would have consulted with an expert in blood evidence *before* settling upon his theory of the case and his decision to attempt, unsuccessfully, to turn it into a pure credibility contest. This is indeed precisely what *Strickland* requires.[7]

Despite the centrality of the source of the pool of blood to Richter's defense, counsel consulted no forensic expert as to what type of expert testimony or evidence might be available, conducted no forensic investigation whatsoever with respect to the blood pool, and in the end, as a result, offered no expert testimony to explain its source. Nor did he seek to obtain a forensic consultant who could assist him in evaluating the tes-

---

[7]Counsel need not, of course, "consult an expert on every conceivable evidentiary issue." Dissent at 10711. Nor must he adopt a "scorched-earth" investigative strategy. *Id.* at 10712, 10745 n.15. In the circumstances of this particular case, however, counsel *was* obligated to consult with forensic experts on blood evidence in order to provide adequate representation to his client. The point here is that the pool of blood was critical to the defense, and that counsel therefore was required to investigate the availability of forensic evidence that might prove its source — not only "because it was *possible* that the State might introduce similar experts at trial," *id.* at 10712, but more important, because counsel had an independent obligation to develop his client's case and to present as strong a defense as possible.

timony of the prosecution's experts or guide him in developing effective cross-examination of those witnesses. Other than a conversation in the hallway with the prosecution's serology expert in the midst of trial, at no point either before or during the trial did defense counsel consult any expert on blood evidence in an attempt to determine the nature of the defense that could be presented or to discover how expert testimony might be used to bolster his client's case or undermine the prosecution's. He made no effort to find or develop expert testimony on such important questions as the blood type of the person or persons whose blood formed the pool in the doorway; whether Johnson's injuries were severe enough to create such a large pool of blood; and, most important, whether the blood spatter around the pool of blood indicated how or from whom the blood had been deposited in the pool.

Counsel's failure to consult any forensic expert constituted a threefold abrogation of his duty under *Strickland*. Counsel's first failing lay in his inadequate investigation *prior* to settling on a trial strategy; his second, in failing to conduct the necessary investigation before trial to determine what forensic evidence might be available for him to introduce or how expert testimony might support the theory he had chosen; and his third, in failing to consult experts who could assist *during* trial when the State, foreseeably, introduced damaging expert testimony regarding the blood evidence in the case.[8]

---

[8]We do not, as the dissent complains, "force counsel to seek expert advice at every stage of the proceedings, even when counsel believes that it will not be helpful and will detract from the other issues counsel must confront." Dissent at 10711. Rather, we fault counsel for failing to conduct the requisite investigation about a critical issue in the case at the *first* stage — before settling on his defense strategy — and then for failing to rectify his deficient performance at any of the subsequent times he had the opportunity to do so.

Counsel had three separate opportunities to consult with forensic experts about the source of the pool of blood. Had he consulted an expert at the outset, it would have been unnecessary to repeat his investigation

**1.**

**[1]** *Strickland* obligates defense attorneys to make reasonable investigations *before* settling on a trial strategy or, at the least, to conduct sufficient inquiries to make an informed decision about whether further investigation is needed. *See Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (holding counsel must make an "informed choice" among possible defenses); *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reason-

---

at each subsequent stage; he would have only had to follow through on the information obtained from his initial investigation as appropriate — in this case, by presenting expert testimony at trial and by employing expert advice as to how he could effectively cross-examine the prosecution's witnesses or counter their expert testimony with expert testimony of his own. Counsel failed, however, to investigate at the first opportunity. Having done so, he had a continuing constitutional obligation to perform that duty at each subsequent opportunity. Each time, he failed to do so. This clearly constitutes deficient performance.

Moreover, the dissent fails to explain how counsel was in a position to make a reasonably informed decision as to whether expert assistance would be helpful at any of these three stages, given his admitted lack of knowledge about the relevant fields of forensic science. *See Strickland*, 466 U.S. at 690-91 (holding counsel's strategic choices are entitled to deference to the extent they are supported by reasonable professional judgments). Counsel admitted that he had no independent knowledge of blood type or blood spatter science before he began working on this case. He further admitted that he did not conduct independent research to educate himself about either science until mid-trial, when he read a single book about blood typing the night before Spriggs' testimony, and his deposition testimony is silent on any research or investigation he conducted that would have allowed him to make an informed decision as to whether a blood spatter expert would be helpful in interpreting the forensic evidence. Thus, the record demonstrates through counsel's own testimony that he could not have made an informed decision leading up to trial that seeking expert assistance would be unhelpful or counterproductive.

able decision that makes particular investigations unnecessary."); *see also Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*." (emphasis in original)). Until a reasonable investigation is conducted, counsel is not in a position to make critical strategic decisions or settle on a trial strategy — certainly including the decision to rest on his client's testimony irrespective of the forensic facts. We have repeatedly held that "[a]n uninformed strategy is not a reasoned strategy," *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008), *cert. denied sub nom. Schriro v. Correll*, No. 08-430, 2009 WL 56214 (Jan. 12, 2009), and we have followed the Supreme Court's holding that "the traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments,' " *id.* at 948-49 (quoting *Wiggins*, 539 U.S. at 521).

[2] Counsel's strategy, as explained in his deposition, was to pit his client's credibility against Johnson's and to attack the evidentiary gaps in the police investigation of the crime scene. In light of *Strickland*, it was not reasonable to settle upon this strategy, as counsel did, without investigating whether it was a sound one. Counsel made no inquiry into what expert testimony might be available to support, or to contradict, his client's version of what occurred; by what means the perceived evidentiary gaps in the State's investigation might be filled at or before trial; how any testing to fill those gaps would affect either his client's or Johnson's credibility; or how he could respond to, or minimize the effect of, the damaging testimony that might emerge from forensic blood testing. Counsel's decision not to consult *any* forensic expert in blood evidence before settling upon a defense strategy that excluded the use of expert testimony, when the defense so clearly depended upon the source of the pool of blood in the doorway, indubitably fails to meet *Strickland*'s

standard of care. *See Strickland*, 466 U.S. at 690-91. Indeed, this failure, in itself sufficient to require a holding of deficient performance, marked only the beginning of counsel's inexplicable series of ineffective acts and omissions.

**2.**

[3] Having chosen his trial strategy without conducting an adequate investigation, counsel then continued to perform deficiently by failing to consult an expert on blood evidence while preparing for trial. A reasonably competent attorney would have made inquiries of such an expert regarding what evidence might be available that would strengthen the chances that his "he said-he said" strategy would succeed or might cause him to broaden that strategy were he to locate an expert whose testimony would support his client's statements. For some unexplained reason, counsel again failed to consult *any* blood expert who could provide advice as to what forensic evidence might be adduced to support Richter's version of the events — or what forensic evidence the State might adduce, either prior to or during trial, that might seriously undermine the defense, and how that evidence might be countered.[9]

---

[9]We agree with the dissent that counsel's decision not to ask the prosecution to *test* the blood sample before trial in order to determine the blood type was not unreasonable, as such a test might have eliminated existing ambiguities that were useful to the defense and instead have produced definitive results that were damaging. However, there could have been no negative consequence to *consulting* a blood spatter expert or a serology expert prior to trial. An adequate pretrial investigation would not have alerted the State to counsel's strategy, or somehow "cooked his own client." Dissent at 10711. Had counsel consulted a blood spatter expert, the State would have been unaware that he had done so until the point at which counsel presented expert testimony at trial, and then only if he made an informed decision that doing so would be helpful to the defense. Had counsel consulted a serology expert, the State would similarly have been unaware of such pretrial consultations unless and until counsel made an informed decision to ask the expert to test the blood type, or until he presented the expert as a witness to counter the testimony of the State's serology expert. Such consultations would not, therefore, have posed any risk. They would, however, have provided crucial assistance to counsel in deciding whether or not to present expert testimony, as well as in preparing for the possibility that the State would introduce adverse forensic evidence.

Instead, counsel willfully pursued his credibility theory, determined to rely on Richter's testimony alone, knowing all the while that his client was not a witness likely to appear particularly credible to a jury. In doing so, counsel not only neglected the opportunity to discover the availability of objective corroborating forensic evidence in support of his client's version of the facts, but also rendered the defense vulnerable to impeaching expert testimony that he was not prepared to rebut.

**[4]** Counsel is obligated to conduct a reasonable investigation in order to present the most persuasive case that he can. Counsel must conduct a pretrial investigation into the availability of independent, objective sources to support the part of his client's testimony that he knows or can reasonably expect will be challenged, and subsequently to present to the jury any evidence he finds that tends to show his client's innocence, tends to undermine the prosecution's case, or raises a reasonable doubt as to his client's guilt, unless he makes an informed, strategic decision that the risks of introducing such evidence outweigh its benefit to the defense. *See, e.g., Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995) ("An attorney 'must provide factual support for the defense where such corroboration is available.' . . . Failure to pursue such corroborating evidence with an adequate *pretrial* investigation may establish constitutionally deficient performance." (quoting *United States v. Tucker*, 716 F.2d 576, 594 (9th Cir. 1983)) (internal alterations omitted) (emphasis added)); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (granting "an evidentiary hearing on the issues of his attorney's failure to investigate . . . before trial and his lawyer's failure to test the evidence"). In some circumstances, such corroboration may take the form of eyewitness testimony or character witnesses. In this case, a forensic explanation of the source of the pool of blood at the bedroom doorway could have supported the defendant's account. Counsel made no effort to obtain any evidence or expert assistance that would provide such an explanation. "This court has repeatedly held that 'a lawyer

who fails adequately to investigate and introduce evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.' " *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008) (quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)) (internal alterations omitted), *cert. denied sub nom. Duncan v. Ayers*, No. 08-7440, 2009 WL 735709 (Mar. 23, 2009). The obligation to investigate only grows more imperative where the evidence at issue is the "only forensic evidence" that could reasonably support the defense theory. *Duncan*, 528 F.3d at 1236 ("[T]he central role that the potentially exculpatory blood evidence could have played in [the defendant's] defense increased [counsel's] duty to seek the assistance of an expert.").

We therefore strongly reject the district judge's conclusion that counsel's investigation was understandably hamstrung by the element of surprise — that his failure to consult experts was reasonable because he did not learn until mid-trial that the State would call a blood spatter or serology expert, and that he was at this point struggling to deal with significant time constraints and the limitations of his co-counsel. *See Richter v. Hickman*, No. S-01-CV-0643-JKS, 2006 WL 769199, at *8 (E.D. Cal. Mar. 24, 2006). This argument truly misperceives the duty of counsel to investigate. The unfortunately harried circumstances in which counsel found himself in the midst of trial, *a year after the events in question took place*, do not excuse his failure to investigate prior to trial — indeed prior to determining the defense strategy — whether expert testimony would corroborate or undermine his client's explanation of how the pool of blood came to lie on the floor by the bedroom door. Whether or not the prosecution presented any expert testimony about the pool of blood, defense counsel had an obligation to investigate and, should his investigation prove successful, introduce expert testimony regard-

ing its source in order to provide crucial — indeed, potentially outcome-determinative — corroboration for his client's story.[10]

Finally, we reject the district court's conclusion that counsel's failure to consult experts in preparation for trial was reasonable because counsel thought that the case was, at bottom, a credibility contest. *Richter*, 2006 WL 769199, at *7-8. Precisely the opposite is true. Where the defense strategy is to

[10]We also reject the excuse that counsel believed that the prosecution would not present any expert testimony. That the State would present expert forensic testimony was entirely predictable. To the extent that counsel believed otherwise, relying on the element of surprise in telling a story of self-defense that the prosecution had not anticipated, in which Klein was killed not on the couch but near the doorway to the bedroom, his performance was unreasonable. Any competent counsel would have known that, whatever element of surprise he might have counted on would be dissipated when he disclosed in his opening statement that he would attack the prosecution for failing to conduct necessary forensic investigations to prove that Klein was killed on the couch rather than by the doorway. That is precisely what occurred. Following counsel's opening statement, the prosecution investigated the availability of such forensic evidence forthwith, leaving the defense as the only party without expert testimony. Counsel failed completely to prepare for the possibility that the prosecution would obtain such evidence and, consistent with his performance up to that point, failed to consult any expert to determine how to handle the State's likely response to his client's version of the events. As a result, once he was confronted at trial by forensic evidence that undermined the theory he had presented to the jury, he had to hastily try to educate himself in order to prepare for cross-examination, had no informed basis for evaluating whether his cross-examination of the prosecution experts would be effective, and failed, once again, given the time constraints, to retain and call experts to develop alternate testimony, attack the prosecution expert's methodology as unsound, or even advise him as to how to perform an adequate cross-examination.

As it turned out, then, counsel guessed wrong when he thought, unreasonably, that the source of the blood would be determined entirely through a credibility contest rather than expert testimony. Guessing wrong does not usually amount to incompetent representation; even the best lawyers guess wrong on occasion. But being unprepared for the consequences of a wrong guess, when the issue is critical to the defendant's case, may well amount to ineffective performance.

win a credibility contest, the importance of corroborating the accused's testimony with physical evidence is paramount. Leaving the jurors to believe or disbelieve defendants solely on the basis of their own testimony, without supporting evidence, where such evidence could be obtained with diligent investigation, is objectively unreasonable. *See, e.g.*, *Riley v. Payne*, 352 F.3d 1313, 1319-20 (9th Cir. 2003) ("[W]ithout any corroborating witnesses, [Riley's] bare testimony left him without any effective defense." (internal quotation marks omitted)); *Hart*, 174 F.3d at 1070 ("Defense counsel failed to investigate or introduce into evidence the records that fully corroborated [the witness's] statements. Thus, the jury was left to decide, without benefit of supporting or corroborative evidence, whether [the witness's] testimony was truthful and accurate, or whether it was unreliable or offered simply in an effort to assist a former lover."); *Lindstadt v. Keane*, 239 F.3d 191, 203 (2d Cir. 2001) ("[I]n a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important." (quoting *Williams v. Washington*, 59 F.3d 673, 681-82 (7th Cir. 1995))). Relying on a pure credibility contest without seeking to investigate the availability of corroborating evidence is unreasonable regardless of the witness; it is at its most unreasonable, however, when the witness is the defendant himself — especially when he is an admitted drug offender who stands accused of committing murder and attempted murder in the course of a burglary.

**[5]** If counsel's decision not to consult experts in preparation for trial had been a "strategic judgment," it would have been an unreasonable one, as there was no adequate investigation to support it. *See Strickland*, 466 U.S. at 690-91. But, even more fundamental, counsel's performance in this respect was not "strategic" at all. There was absolutely no reason not to consult a blood expert and counsel never suggested that there was. In his deposition, counsel was unable to provide any reasoned explanation for failing to consult forensic experts or to seek expert testimony in order to corroborate his client's testimony or prepare to rebut the prosecution's case.

Certainly, he did not suggest that any strategy explained that failure. When counsel offers no strategic reason for failing to perform what would otherwise constitute the duty of a reasonably competent counsel, we may not invent such a strategy by engaging in "a *post hoc* rationalization of counsel's conduct" in lieu of relying on "an accurate description of [counsel's] deliberations prior to [trial]," *Wiggins*, 539 U.S. at 526-27.[11] Counsel's chosen trial strategy, as *he* explained it, was to convince the jury of an alternative set of facts to those presented by the prosecution — and to rely on his client's testimony to carry the day in a pure credibility contest. The defense testimony would be that Klein was killed in the doorway, in a shootout, and the alleged robbery of the gun-safe never took place. Counsel provided no reason why he did not consult experts to bolster that story. Although he had an obligation to adequately investigate so as to support the strategy that he had adopted, he failed to do so. It is perfectly clear, and indeed it is the only reasonable conclusion under *Strickland*, that his performance was constitutionally deficient.[12]

---

[11]Despite the dissent's allegation that we have retroactively imposed our own theory of the case, Dissent at 10712, we in no way suggest a new or different strategy for counsel. Rather, it is our dissenting colleague who has suggested a strategic rationale for counsel's actions that finds no support in the record. *See* Dissent at 10747-48 (suggesting that counsel did not consult a blood spatter expert because he "had good reason to believe that a blood spatter expert would not be able to confirm his client's story"). Our colleague's valiant but wholly unpersuasive explanation indubitably constitutes a "*post hoc* rationalization of counsel's conduct."

[12]The present case is therefore unlike *Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009), in which counsel made a careful, strategic, and reasonable decision not to pursue a hopeless defense. In that case, there was no failure to investigate; counsel, after investigating, had drawn a well-informed conclusion that it was futile to present a defense of not guilty by reason of insanity to a jury that had convicted the defendant of first-degree murder after considering the same evidence of mental illness. Counsel's failure here to present expert testimony on the source of the pool of blood was not, by contrast, a well-considered decision; rather, it was the result of his failure to investigate in order to seek to discover available evidence that might be critical to his case. Nor would presenting such forensic evidence have been an exercise in futility. As will be discussed with regard to prejudice, it would instead have significantly undermined a critical aspect of the prosecution's case.

**3.**

**[6]** Counsel's failure to conduct the necessary pretrial investigation was compounded finally by his failure to consult experts as the trial unfolded. After counsel presented his opening argument laying out the defense strategy and pointing out the gaps in the prosecution's case, including its incomplete forensic investigation, the State acted quickly to fill some of these gaps and to determine whether it could prove its case or at least disprove the defense theory through the use of forensic evidence. The State then introduced "surprise" testimony from two experts on blood evidence: a blood spatter expert and a serology expert. The thrust of their testimony was that the sole source of the blood in the pool was Johnson and that none of the blood was Klein's.

The prosecution's blood spatter expert, Detective Robert Bell, testified that it was highly unlikely that Klein could have been killed in the doorway and carried to the couch, primarily because of blood flow patterns on his head and high velocity blood spatter near the couch. After this damaging testimony, defense counsel considered consulting a blood spatter expert of his own. He discussed with Richter whether to call such an expert, and opted to wait until after cross-examination to decide. Counsel researched and gathered names of potential blood spatter experts, but does not remember contacting anyone. He failed to request a continuance in order to obtain expert testimony to counter the prosecution's evidence, or even to obtain assistance in preparing for cross-examination of the prosecution's witnesses. Indeed, he did not consult an expert at any point after Bell testified, even though Bell was recalled twice, including once on rebuttal, during a trial that lasted nearly a month.

The prosecution also called a serology expert, Jill Spriggs, who tested the blood type of a sample of blood on the door molding above the blood pool in the doorway and testified she had "no reservations. [Klein] is excluded as a possible donor

of that sample." Counsel again considered the possibility of consulting an expert, this time on blood typing, but he did not do so. After speaking with the State's serology expert in advance of her testimony during trial, counsel was prompted to do some reading on his own, and again to compile a list of potential experts, but he could not recall actually contacting anyone. When the State announced its intention to call Spriggs as an expert witness, counsel raised an objection. According to counsel, the judge then "said that [counsel] may need a continuance and that [he] may need to call an expert now [him]self." Counsel offered conflicting testimony as to whether he did, in fact, request a continuance this time. It is clear, however, that again he did not consult any blood expert whatsoever.[13]

[7] In the end, counsel again failed to consult a single expert in the field of blood evidence, this time to help him prepare for his cross-examination of the State's two expert witnesses once he knew that they would testify. He, further, made no effort to consult forensic experts so as to present testimony in rebuttal.[14] When the need for expert advice was

---

[13]The research that counsel conducted on his own after learning about Spriggs' upcoming testimony was more modest than the dissent suggests: at his deposition, counsel testified that a librarian helped him find "several different books, one of which [he] took home and read."

[14]The dissent excuses this mid-trial failure by explaining that counsel acted reasonably by relying solely on his cross-examination of the State's serology expert instead of introducing expert testimony of his own that might have been available. Dissent at 10734-35. That position is simply erroneous. When defense counsel obtains concessions from the witness on cross-examination, that may on occasion be sufficient to establish reasonable doubt. It is not ordinarily, however, a substitute for affirmative evidence that would directly prove the point to be established. Here, equivocal statements by a prosecution witness in no respect serve the same function as positive affirmations by defense experts. That would seem to be an elementary tenet known to all trial lawyers. Moreover, in this case, Spriggs repeatedly disavowed any possibility that Klein's blood was in the pool. She did admit that if the blood sample was degraded, it would be possible that the 1+ band would be less intense than she expected, but she

abundantly clear, counsel still failed to take reasonable steps mid-trial to remedy his deficient pretrial investigation and preparation. That failure was itself deficient, and the state court's decision to the contrary was objectively unreasonable.

**4.**

**[8]** In short, the Supreme Court has held that the touchstone of our inquiry must be the *reasonableness* of counsel's conduct. The failure here to consult forensic experts regarding critical issues in the case was unreasonable and constitutes deficient performance. Other circuits, also under deferential AEDPA review, have come to similar conclusions. *See Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (finding deficient performance under AEDPA where "the failure to investigate the forensics of the fatal bullet deprived [the defendant] of a substantial argument, and set up an unchallenged factual predicate for the State's main argument that [the defendant] intended to . . . . [The defendant] became the sole source of evidence available to counter the prosecution's

---

saw no indication that in this case the sample was degraded. On redirect, she repeated conclusively that she had "no reservations. [Klein] is excluded as a possible donor of that sample." From the standpoint of a jury, the cross-examination of Spriggs was in no way comparable to the *evidence* that could have been introduced by an expert witness for the defense.

Moreover, where an attorney lacks expertise in a scientific subject such as blood typing, he is in a poor position to determine whether his cross-examination has touched upon the most important weaknesses in the expert's testimony. If counsel in fact decided that another expert would not "interpret the serology evidence any differently than the State's expert," Dissent at 10735, as the dissent without any support claims that he did, he made that assessment based not upon a reasonable investigation but entirely on speculation. In fact, counsel quickly realized after trial that he had failed to question Spriggs adequately about reasons for the relative intensity of the 1+ band other than degradation, important evidence that an expert, had one been consulted, would have been able to quickly point out.

theory.”); *Gersten v. Senkowski*, 426 F.3d 588, 607-08 (2d Cir. 2005) (finding deficient performance under AEDPA where “defense counsel failed to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution’s witnesses, any medical expert on child sexual abuse”). Here, the source of the pool of blood was critical. If the blood came in whole or in part from Klein, defendant’s version of the events would be strongly corroborated. If it came from Johnson alone, the prosecution’s case would be strengthened immeasurably. We conclude that counsel’s failure to consult *any* forensic experts regarding how to establish that source (1) before settling on his defense, (2) when preparing for trial, or (3) during the course of trial when he was surprised by the prosecution’s expert testimony cannot be deemed to be reasonable under any standard, and that the state court’s failure to so determine unquestionably constituted an objectively unreasonable application of *Strickland*.

## B.   Prejudice

Richter must show more, however, than his counsel’s deficient performance. He must also show that he was prejudiced by that performance — that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” *Strickland*, 466 U.S. at 694. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” *Id*. Applying this standard, we hold that counsel’s deficient performance was prejudicial, and that the state court’s failure to so conclude was an objectively unreasonable application of *Strickland*.

Counsel’s pretrial failure to consult experts who could have interpreted the blood evidence at the crime scene and advised him of its significance had direct, and damaging, consequences. Counsel developed a strategy for trial to treat the case as a pure credibility contest, to call only the defendant as a witness regarding the shooting, and to criticize the state’s incomplete investigation of the crime scene, without any

knowledge whether forensic evidence, if introduced, would corroborate or contradict his client's testimony. He assumed that the prosecution would not offer any expert forensic evidence to support the testimony of its principal witness and did not prepare for the possibility that it would. In the end, the prosecution did introduce damaging expert testimony on blood spatter and blood typing that undermined Richter's account and the defense theory as a whole. At this point, counsel was unequipped to respond to it. These negative consequences, in turn, were exacerbated by counsel's failure during the trial to make reasonable efforts to compensate for his inadequate pretrial investigation; even at this point, he did not consult a single expert who could advise him whether exculpatory evidence existed that he might present or how he might successfully cross-examine the prosecution's experts or counter their testimony. Critically, as a result, counsel failed to introduce any expert testimony — testimony that could likely have raised reasonable doubts in the minds of the jurors.

Counsel's failure to present expert testimony at trial did not go unnoticed. In closing, he emphasized the significance of the pool of blood in the doorway, citing it as evidence of the location at which Klein had been killed. The prosecutor, in response, drove home the fact that the defense had presented no evidence to support its version of the events, other than Richter's testimony. He then ridiculed defense counsel's failure to present any evidence to support his account of the source of the pool of blood, and especially *his failure to call any expert witnesses*:

> Bob Bell, [the state blood spatter expert,] he's 22 years as a blood spatter expert, all that stuff means nothing. Hey, [defense counsel] says, the blood be here. Bob Bell, hey he's wrong, trust me. *I am not going to go get an expert.* I am not going to bring somebody in here to tell you because I don't need to do it. I will just do it in closing argument. I will just

say it. If you are willing to believe me, hey, that will work.

I am not going to worry about Jill Spriggs[, the state serology expert,] because, hey, her seven years as a biochemist and a criminalist, and the fact that she went to college to learn this stuff doesn't mean anything, because I am a lawyer. I went to California, Berkeley, in 1975 and U.O.P. and played ball in Mexico, and I know more than Jill Spriggs. *But I am not going to pay and bring in an expert to show you.* I am not going to put anyone up here to tell you that. I will just tell you that. I am a lawyer. I can do it.

(Emphasis added). Because expert testimony that contradicted that offered by the prosecution was in fact available, and strongly persuasive, the harm caused by counsel's failure to make any effort to obtain it is readily apparent, and devastating.

Had counsel bothered to conduct the requisite investigation, his efforts would have been highly productive. On state and federal habeas review, Richter's new counsel conducted the investigation that trial counsel had failed to perform, and with significant effect. Habeas counsel submitted declarations from four experts in blood evidence, all of whom would have offered testimony that supported the defense theory of the case. Taken together, they would have established reasonable doubt.

Most significant, and most damaging to the prosecution, Ken Moses, an expert in blood spatter analysis with over thirty years of experience in the field, would have directly refuted the prosecution's explanation as to the source of the critical pool of blood. Specifically, he would have offered his opinion that "[t]he lack of a large number of satellite dropletts [sic] surrounding the pool *eliminates* the prosecution's theory that Mr. Johnson was standing into [sic] the doorway dripping

into the pool below" (emphasis added). Moses would have been a most persuasive witness. He had established the Crime Scene Investigations Unit of the San Francisco Crime Laboratory in 1983 and, over the course of his career "[a]s an Inspector-Sergeant and senior crime scene investigator with the San Francisco Police Department . . . investigated hundreds of violent crimes . . . in which [he] applied the science of bloodstain pattern interpretation," and had on numerous occasions been qualified as an expert.

Additionally, James Thornton and Brian Wraxall, experts in blood typing, would have testified to the scientific possibility that the pool contained some of Klein's blood, because the relative intensity of the 2+ and 1+ bands found in the blood sample could not exclude the possibility that the blood pool contained a mixture of Johnson's (subtype 2+ 1+) and Klein's (subtype 1+) blood. Finally, Dr. Paul Herrmann, a pathology expert, would have opined that,

> [g]iven Mr. Johnson's testimony and the amount of blood likely to result from the wounds which he received, and the short time between Mr. Johnson being shot and Detective Wright making his observations of Mr. Johnson, it is highly unlikely that the blood pool found in the doorway between the bedroom and living room was caused by Mr. Johnson's wounds.

No such expert testimony was presented to the jury.[15]

---

[15]The parties stipulated that the defense experts would testify to the information sworn to in their declarations. In their declarations the experts stated that they would have been available to testify as to their opinions if they had been called at trial. We therefore consider the statements in these declarations as the relevant testimony that could have, and would have, been presented at trial.

**1.**

Although the failure to consult any forensic expert with respect to blood evidence constituted deficient performance, the investigation conducted during the habeas proceedings reveals that the primary source of prejudice lay more narrowly in counsel's failure to consult, and subsequently to call, an expert in blood spatter.

**[9]** To explain the significance of the blood spatter testimony, it is necessary to reiterate the importance of the pool of blood — that it was, in fact, the linchpin of the defense. If Klein was killed while lying on the couch in the living room, there was no possibility that Richter's account was correct. If, in contrast, Klein was killed in the doorway to the bedroom, Johnson's account of the events in question could not possibly be true. Indeed, if any portion of the blood in the pool in the doorway came from Klein, he could not have been shot, as Johnson claimed, while he was asleep in another location. Accordingly, had defense counsel been able to raise a reasonable doubt in the minds of the jurors as to whether Klein was a source, in any part, of the pool of blood, there was more than a reasonable chance that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The introduction of forensic evidence that had the effect of showing that Johnson's version of the events was false, and that was consistent with Richter's explanation, would therefore have been invaluable to the defense.

Had counsel conducted an adequate pretrial investigation and, as a result, offered Moses' blood spatter testimony at trial, the jury would have been presented with testimony from two expert witnesses on blood spatter, one for the prosecution (Bell) and one for the defense (Moses), each of whom would have contradicted key pieces of the theory presented by the opposing side. On the one hand, the spatter evidence presented by Richter's habeas counsel would have conclusively refuted the prosecution's explanation of the source of the all-

important pool of blood: that it contained only Johnson's blood, which dripped to the floor as he stood awaiting the police's arrival. Indeed, Moses' expert testimony that the pool could not have been formed in that manner remains undisputed. On the other hand, the prosecution's unrebutted testimony about high velocity spatter near the couch and the blood flow on Klein's face would have supported the conclusion that Klein was killed on the couch. Each expert's testimony was material to resolving the central dispute in the case: Klein's physical location when he was shot and, by extension, the circumstances of Klein's death and the credibility of the key participants.

In the absence of Moses' testimony, the only expert explanation of the evidence that the jury heard was consistent with the prosecution's version of the case. Had the jury also heard expert testimony from Moses, it would have been faced with highly credible forensic evidence from an experienced former law enforcement officer that directly contradicted the prosecution's version and raised substantial doubt as to the testimony regarding the circumstances of Klein's death offered by the key prosecution witness. At this point, to reconcile either Johnson or Richter's narrative with the forensic evidence, the jury would have had to conclude that one blood spatter expert or the other was wrong or untruthful. We cannot, of course, determine which expert the jurors would have believed, or if they would have been able to determine beyond a reasonable doubt that one or the other was correct. We can determine, however, that, under these circumstances, counsel's failure to present blood spatter expert testimony undermines our confidence in the result and, accordingly, was prejudicial.[16] More-

---

[16]The dissent advances a curious argument why the failure to introduce blood spatter evidence could not have been prejudicial. Because Bell's unrebutted testimony that the high velocity spatter on the couch meant that someone had to have been shot there, the dissent reasons — derisively — that the jury could accept Richter's story that Klein had been shot by the bedroom door only by creating a third shooting victim who had been shot

over, because the prosecution's case rested so heavily on Johnson's testimony, impeaching his credibility on a central point through forensic evidence would have likely precluded the jury from returning a verdict of guilty.

The expert blood spatter testimony was also essential in light of substantial weaknesses in the prosecution's case, that rendered it highly likely that expert testimony would determine the outcome.[17] Here, neither explanation of the events — neither the story presented by the prosecution nor that presented by the defense — was wholly satisfactory. The prosecution provided no convincing explanation why Richter and Branscombe would have returned to a house that they knew to be occupied to steal a gun-safe that had, only weeks before, been left for safekeeping in Richter's garage. If Richter desired to obtain its contents, it would have been far easier for him to tell Johnson, while it had been left in his possession,

by the couch. *See* Dissent at 10748-49, 10753. The dissent fails to acknowledge, however, that *for a precisely analogous reason*, the jury could accept Johnson's story that Klein had been shot on the couch only by inventing a third shooting victim who created the pool of blood by the bedroom. Given Moses' unrebutted testimony that the blood pool could not have come from someone standing by the bedroom, and given that Johnson did not testify that he squatted, sat, or stretched out on the floor by the bedroom, the jury could not, without a similar degree of creativity, accept the *prosecution's* explanation of the events. The important fact is that a jury — just like the dissent — could not reasonably conclude that both experts were correct while also accepting the prosecution's version of the events. Because we cannot determine which expert the jury would have believed and certainly cannot determine that in light of Moses' testimony it would have found beyond a reasonable doubt that the prosecution's explanation of the events was accurate, our confidence in the outcome is necessarily undermined.

[17]Indeed, it appears likely that it was in part because of the limitations of the State's case — in particular, the credibility problems of its main witness — that it undertook a last-minute effort to gather forensic evidence and then relied so heavily upon that evidence during the remainder of the trial and in closing argument. Refuting the State's forensic case would, therefore, have been critical for Richter.

that a third party had stolen it. Nor did the prosecution offer any explanation for the numerous inconsistencies in Johnson's account of the events in question, including his initial report that there were four or five assailants, then that there were three, and then that there was only one. Nor did it explain Johnson's inability to accurately describe his assailants, even though he later asserted that they were two individuals he knew extremely well. It would appear that at the least Johnson's mental processes were not functioning normally at the time of the shooting — perhaps because of a mixture of drugs and alcohol — which might explain why, in his befuddled state, not recognizing Branscombe, he may have shot what appeared to him to be an intruder when he awoke and saw an unknown person unexpectedly in his house. There were other less important puzzling items, such as Johnson's contradictory testimony about where he kept his .380 caliber gun. Also, the prosecution could not adequately explain why there was no blood spatter on the sleeping bag where Klein allegedly was lying when he was shot, and why there was no blood on the light switch in the bedroom, although Johnson claims that he turned on the light after touching his bloody face. Moreover, Johnson was overall a less-than-credible witness. He was a big-time marijuana and psylocibin mushroom dealer who sold approximately a pound of marijuana per day. He twice received immunity from the prosecution in exchange for his testimony. Johnson was also a prolific gun collector who had at least on one occasion purchased a stolen handgun — the .32 caliber pistol that Branscombe ultimately used to shoot him. Earlier in the evening in question, Johnson had apparently been ready and willing to use his firearm: He had drawn a loaded weapon and pointed it at Richter and Branscombe when he didn't recognize their car in his driveway.

Of course, the defense's explanation, too, had holes. The story Richter told raised a number of questions: Why were there .22 caliber cartridges found in his garage? How had Johnson carried Klein to the couch with so little evidence of blood flow? Why was the safe thrown haphazardly on a pile

of other belongings in Richter's garage, rather than standing upright as a witness had seen it previously? Why had Richter and Branscombe taken off for the Yolo bypass shortly after the killing and not returned until the next day? Why did Richter initially tell the police that his truck was not at Johnson's house on the night in question? Even aside from these questions, Richter suffered from credibility problems. He was a marijuana and mushroom user himself, as well as an occasional dealer.[18]

In light of the weaknesses in both sides of the case, we cannot say definitively that Richter *would have* been acquitted, even had the defense's blood spatter expert testified that blood dripping from Johnson while he stood and waited in the doorway for the police to arrive could not have formed the pool near the bedroom door. There are a number of factual inconsistencies in this case pointing in both directions, and it is impossible to say what verdict the jury might have reached had it heard all the relevant evidence. But certainty has never been the standard to which we hold ourselves, even on AEDPA review. The existence of factual inconsistencies in a case does not absolve defense counsel of the responsibility to investigate; nor does it eliminate the likelihood of prejudice when he fails to do so. Rather, introducing forensic evidence

---

[18]Despite the questions raised by his testimony, we must note that Richter's account was not, on the whole, implausible. The most damaging evidence at trial was Detective Bell's blood spatter analysis. In many other ways, Richter's version of the events, which the dissent deems "highly improbable," Dissent at 10754, was internally consistent and provided a coherent explanation for the evidence introduced at trial. For example, Richter testified that he had been paid in cash on the night of Klein's death; that he dropped a $100 bill at the Yolo bypass was therefore perfectly understandable in light of his testimony. Richter also explained, moreover, why he and Branscombe returned to the Christmas tree lot late at night, rather than waking up a couple of hours later to clean out their belongings from the trailer by the following morning and why they returned to Johnson's house. Also consistent with Richter's explanation, Johnson had in fact tried to modify his M-12, attempting to convert it into a fully automatic weapon, thus explaining why it might have jammed.

that confirms the defendant's version of the event or casts doubt upon the prosecution's is even more critical in such circumstances and even more likely to establish reasonable doubt in the minds of the jurors. Our obligation is to determine whether there is a "reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. A "reasonable probability" does not require certainty, or even a showing that it is "more likely than not" that a different outcome would have resulted. *See Sanders*, 21 F.3d at 1461. Rather, the probability must simply be "sufficient to undermine [our] confidence in the outcome." *Strickland*, 466 U.S. at 694. Here, our confidence is unquestionably undermined. We cannot say — and we do not believe that any reasonable adjudicator could — that the defense expert's spatter testimony, when considered along with all the evidence previously introduced, would not have resulted in reasonable doubt.[19]

**[10]** According the state court the deference mandated by AEDPA, we nonetheless hold that it was an unreasonable application of *Strickland* for that court to conclude that counsel's failure to conduct an adequate investigation into the source of the pool of blood and to adduce expert blood spatter testimony that corroborated the defense's version of the facts, did not constitute prejudice and thus did not violate Richter's Sixth Amendment right to effective assistance of counsel.

**2.**

As we have explained, the blood spatter testimony alone was sufficient to give rise to reasonable doubt in the minds of the jurors. We note, however, that such doubt would have been reinforced had counsel also offered expert testimony on blood typing to rebut that of the State's serology expert.[20] The

---

[19]Of course, contrary to what the dissent appears to believe, the evidence need only raise a *reasonable doubt* as to the defendant's guilt, not conclusive proof of the defendant's innocence.

[20]Taken by itself, the failure to present expert testimony on blood typing did not sufficiently prejudice the defense such that habeas relief would be

expert declarations from Thornton and Wraxall, presented during habeas proceedings, do not prove definitively that Klein's blood was in the pool, but they tend to counter the testimony by the State's serology expert that Klein was excluded as a source of the blood sample taken from the door molding above the pool.[21] The testimony of the two defense experts, if credited, serves to establish the possibility that the pool contained a mixture of Johnson's *and* Klein's blood and raises a reasonable doubt as to the prosecution's contrary view. If that expert testimony had been presented along with Moses' blood

warranted. However, in combinationwith the failure to present expert blood spatter testimony, which *was* prejudicial in itself, the failure to present expert testimony that could have undermined the damaging testimony offered by Spriggs contributed to the overall showing of prejudice.

[21]Indeed, the State's serology expert adhered strongly to this position throughout. On direct examination, Spriggs stated definitively, "I would include Johnson as a possible donor of the human blood on item 14-A, and I would exclude Klein as a possible donor of the human blood on 14-A." On cross-examination, she did not retreat from that position. Prompted by the Court, she stated, "In my opinion, [the sample] does not contain more than one person's blood." When asked by defense counsel whether she could say that to a scientific certainty, she responded, "Based on the testing that I perform with the PGM sub typing it does not look like there are two people contributing to that stain. It looks like one person." Upon further questioning she continued to insist, "So I am going by based on my testing, based on the intensity of the bands, I do not think there are two people there." Spriggs did acknowledge that it was possible that due to degradation a 1+ band might be less intense than expected. On redirect, however, she further explained that the sample did not appear to be degraded, and that if a sample was degraded, one would get an inconclusive answer, not a wrong answer. On re-cross, her unequivocal final conclusion was that she had "no reservations. [Klein] is excluded as a possible donor of that sample."

In light of Spriggs' testimony, and in light of the obvious fact that the *questions* posed by counsel on cross-examination are not evidence and may not form the basis for a jury's conclusions, there would have been a significant benefit to the defense had the jury heard directly from an expert that the possibility of blood mixing existed in this particular case, and that a source of the blood in the pool could well have been Klein.

spatter testimony, the expert evidence as a whole would have allowed the defense to argue that *both* the blood spatter evidence *and* the serology evidence supported — or, in the case of the serology evidence, at least did not conflict with — the theory that the pool contained Klein's blood.

[11] Although we base our prejudice holding on counsel's failure to introduce blood spatter evidence, that holding is bolstered by the detrimental effects of counsel's failure to consult a serology expert — both because he could have introduced expert testimony that would have supported his case and because an expert could have advised him as to how to cross-examine the prosecution's witnesses.[22] *Strickland* requires us to assess the aggregate impact of counsel's deficient actions when evaluating whether such failures are prejudicial. 466 U.S. at 695-96. Here, the jury would have been even more likely to credit Moses' testimony that the blood pool could not have been formed by the dripping of Johnson's blood while he stood waiting for the police to arrive if the prosecution's serology testimony was also cast into doubt.[23] While it would

___

[22]Counsel acknowledged that he missed crucial information when conducting his cross-examination. He "remember[ed] kicking [him]self" after trial because he failed to elicit from Spriggs the possibility that, even without degradation, the mixture of Johnson's and Klein's blood could have produced the 2+ 1+ band it did — due to the proportions of the blood in the pool, or because Johnson had a stronger 2+ band and a weaker 1+ band. Such testimony certainly would have been significant, particularly because Spriggs testified that it did not appear that the sample was degraded. Counsel acknowledged that "where you have experts like this that you can go to so you don't make those mistakes like I made . . . . Sure, you use them whenever you can. They're a great tool." Nevertheless, without the benefit of such a consultation to confirm whether or not he had adequately questioned Spriggs on cross-examination, "at the time I thought I did an okay job."

[23]Similarly, it would have been helpful to introduce expert medical testimony regarding the amount of blood that Johnson could have deposited in the pool, although it would not have been unreasonable to conclude that, standing alone, the absence of that testimony in this case was not prejudicial. The dissent dismisses Dr. Herrmann's expert opinion, in part

not have been unreasonable for the state court to conclude that, by itself, the failure to present serology evidence was not prejudicial, the absence of that expert testimony contributed to the prejudice that resulted from the failure to offer expert blood spatter testimony.

**3.**

To reiterate, we conclude that Richter was prejudiced by counsel's deficient investigation with respect to the critical question of the source of the blood in the pool by the bedroom doorway. The resultant failure to introduce exculpatory expert testimony on blood spatter, as well as other expert testimony that would, together with the spatter testimony, have raised reasonable doubt in the minds of the jurors with respect to that question undermines one's confidence in the outcome of Richter's case. The state court's conclusion to the contrary constituted an objectively unreasonable application of *Strickland*.

**IV.**

In so holding, we need not reach Richter's other claims. Because we have concluded that counsel provided ineffective

---

because in its view this testimony would have been inadmissible at trial. Dissent at 10741-43. We cannot agree, however, particularly in light of the fact that the parties "agree[d] and stipulate[d] that the . . . declarations of petitioners' expert witnesses are admissible for consideration on the merits, and that [the experts], if called to testify, would testify in conformance with their declarations . . . ." We believe, moreover, that this expert testimony would have been both relevant and significant for the jury to consider. Johnson, we must remember, claimed that he immediately called 911 after finding Klein on the sofa and, contended that in the six minutes before the police arrived, he ran around the house, hid the scale on which he measured marijuana, took two trips outside to throw two marijuana plants over the fence, and called his girlfriend's father. That blood was found in various locations around the house does not negate the medical expert's opinion that the pool in the doorway was too large to have come from Johnson. There was little time for such a pool to form, and further corroborative expert testimony on blood pooling could have been persuasive.

assistance by failing to investigate the source of the pool of blood, and then to introduce expert testimony on that point, and because we have also concluded that the state court decision to the contrary constituted an unreasonable application of *Strickland*, we do not consider here whether counsel's failure to investigate the caliber of a bullet hole found in the floor of Johnson's bedroom was also ineffective. Similarly, we need not decide whether counsel's failure to present lay testimony and expert testimony on firearms was ineffective, nor whether the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), in misrepresenting the size of the bullet hole and the inaccessibility of the piece of floorboard containing it that fell into the crawl space below the house. We do not, moreover, decide whether Richter's Eighth and Fourteenth Amendment rights were violated when the state court provided an incorrect or inaccurate answer to a request for clarification that the jury submitted to the trial court during deliberations.

## V.

Counsel's ineffectiveness in failing to investigate and present expert testimony regarding the source of the pool of blood is evident. The state court's decision to the contrary constituted an unreasonable application of *Strickland*. The decision of the district court denying a writ of habeas corpus is reversed, and the matter is remanded with directions to enter judgment granting a writ of habeas corpus ordering that Richter be released unless the State elects to re-try him within 90 days of its entry.

**REVERSED AND REMANDED WITH DIRECTIONS.**

BYBEE, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, and IKUTA, Circuit Judges, join, dissenting:

Years of consuming forensic science television shows have gone to our heads. We know the plot by heart: the hapless State has charged the wrong guy and our scientists-turned-sleuths will come up with the trial-changing evidence at the last minute. But *State v. Richter* isn't the pilot for *CSI: Sacramento*. Real trials are rarely as gratifyingly formulaic as those seen on TV, and real defense attorneys can seldom boast the Holmesian intuition imputed to them by savvy scriptwriters. In the real world, defense attorneys must often contend with an unsympathetic bench, financial and temporal pressures, and unexpected evidentiary developments. They must also sometimes decide between various unappealing defense strategies. When we ignore these gritty realities and do not adequately analyze the specific circumstances surrounding an attorney's performance, we inevitably fail to heed the Supreme Court's admonition about second-guessing trial counsel. *See Strickland v. Washington*, 466 U.S. 688, 689 (1984).

The majority opinion is a model of the intrusive post-trial inquiry into attorney performance long rejected by the Court. It declares the blood evidence to be "the single most critical issue in the case," one that "any competent defense counsel would have immediately recognized." Maj. Op. at 10681. This would have come as a surprise to both the State—which had focused on other physical evidence and had not even taken a blood sample from the victim before trial—and Richter's counsel, who knew the limited parameters of the State's evidence. What the majority is now convinced was the "central dispute" in the case, Maj. Op. at 10680, sent both sides scrambling mid-trial. The majority now proclaims that no competent counsel could fail to understand the importance of acquiring expert witnesses to testify on the blood evidence, ignoring both the circumstances of the case and counsel's own deposition testimony establishing why he had no reason

to believe that such experts would be helpful. As counsel explained, the State had built its case on other evidence and had no witnesses on its list to testify about blood evidence. More importantly, if counsel had conducted the pre-trial investigation demanded by the majority, it not only would have alerted the State to counsel's defense but might well have resulted in the discovery of additional *inculpatory* evidence. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant," *Wiggins v. Smith*, 539 U.S. 510, 533 (2003), or if counsel has "reason to believe that certain investigations would be fruitless or even harmful," *Strickland*, 466 U.S. at 691. Had counsel followed the majority's recipe, he might have cooked his own client. Counsel had no way of knowing which way the blood evidence might turn, and he had very good reasons for suspecting that it would not favor Richter. So, his strategy was to address the other physical evidence the State was presenting and then fault the State for its own failure to investigate. The Court has recognized that this is a perfectly reasonable strategy. *Id.*

Far from being "nothing novel," Maj. Op. at 10669, the majority's holding plainly enlarges the constitutional duty of defense counsel to seek out and present expert testimony. The majority's single-minded approach faults counsel for failing to consult with forensic experts (1) before he developed his trial strategy, Maj. Op. at 10683-85; (2) before trial once he selected a strategy, Maj. Op. at 10685-90; and (3) during the trial, Maj. Op. at 10691-93. Our decision will force counsel to seek expert advice at every stage of the proceedings, even when counsel believes that it will not be helpful and will detract from the other issues counsel must confront. Furthermore, counsel must now consult an expert on every conceivable evidentiary issue, because our ability to second-guess counsel's decisions knows no bounds. The majority, for example, criticizes counsel for failing to consult two serologists, a forensic pathologist, and a bloodstain pattern expert in

part because it was *possible* that the State might introduce similar experts at trial.

Unlike the cases where the Supreme Court has found *Strickland* error, this is not a case where counsel so neglected his client that "counsel was not functioning as 'counsel.' " *Strickland*, 466 U.S. at 687. Throughout the proceedings, Richter's counsel was conscientious and well-prepared. When the State came up with surprise witnesses to address the blood evidence, counsel diligently prepared for cross-examination and considered whether, in addition, he should retain an expert. He ultimately decided against it, a judgment that majority is more than willing to second-guess. It is not clear, even today, what counsel was supposed to discover. Indeed, nearly fourteen years after the trial, Richter cannot point to any new evidence that affirmatively supports his innocence.

In sum, the majority holds today that defense counsel was required to adopt a different trial strategy—the majority's scorched-earth investigative strategy—and assume new burdens that this new strategy creates. Both counsel's original strategy and the majority's new tactics have some merit, and neither can solve all Richter's problems. But the only reason the majority's strategy prevails over counsel's is that it gets to go last, and counsel's strategy, having proven unsuccessful, can be second-guessed.

I respectfully dissent.

## I

Mark Twain once advised never to let the facts get in the way of a good story. The Supreme Court, however, has made apparent that such cannot be the case in determining whether a trial attorney has unconstitutionally deprived a habeas petitioner, through ineffective performance, of his Sixth Amendment right to counsel. Rather, applying the standards of *Strickland* requires a "case-by-case examination of the evi-

dence." *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in the judgment)). Because I believe the majority's story lacks this requisite substance, I recount the facts and the case from "counsel's perspective at the time" before expressing my opinion that defense counsel's performance was reasonable "in light of all the circumstances." *Strickland*, 466 U.S. at 689-90.

A

From all appearances this was an open-and-shut robbery/homicide. After receiving a 911 call on the morning of December 20, 1994, Sacramento County Deputy Sheriff (and detective) Michael Wright, and his partner, Deputy Steve Larson, arrived at Joshua "Gunner" Johnson's house at 5:06 am. Wright entered the house to find Johnson with blood covering his cheeks, shirt, hands, and right shoulder. He saw a man later identified as Patrick Klein lying unconscious on the living room couch, on top of a sleeping bag, with what appeared to be a bullet wound to his left eye. After calling for medical assistance, Wright talked with Johnson, who claimed that he had been attacked earlier that morning.

Both Johnson and Klein were transported to a nearby hospital, where Klein died from his wounds. At the hospital, the attending physician discovered that Johnson had been shot twice: once in his cheek, where the bullet severed an artery and had lodged near his spine; and once in his shoulder. The physician noted that Klein had also received two wounds: a "fairly superficial" wound to his neck, and the fatal wound to his left eye. Both bullets that struck Klein were recovered from his body—the one that entered his neck was determined to be a .22 caliber, and the one that pierced his eye was a .32 caliber. The one bullet recovered from Johnson also was determined to be a .32 caliber.

While at the hospital, Johnson identified the perpetrators as Joshua Richter and Christian Branscombe. Johnson told

police that he remembered waking up shortly before 5:00 am to see Richter and Branscombe in his bedroom attempting to steal his gun safe. He sat up, but was immediately shot by Branscombe. After hearing one or more gunshots in the living room, he stood up and noticed that his Cobray M-12 pistol (usually kept on his nightstand) was missing, along with his gun safe and a hip sack containing a pager and around $6000 in cash (proceeds from his daily drug sales). After stumbling into the living room to find Klein bleeding to death on the sofa, Johnson locked the door and called 911. He then ran into the backyard to dispose of several marijuana plants and other drug paraphernalia before the police arrived.

The evidence discovered at Johnson's house largely corroborated Johnson's recollections. About two hours after the 911 call, the police department dispatched homicide detectives to Johnson's residence to analyze the crime scene. Lead detective Robert Bell discovered two expended .32 caliber shell casings in Johnson's bedroom where Johnson claimed to have been shot by Branscombe. The detectives located Johnson's pager lying in the front yard by the porch steps—consistent with Johnson's story that Richter and Branscombe had stolen his hip sack. The detectives uncovered an expended .32 caliber shell casing and an expended .22 caliber shell casing in the living room, resting on a pile of clothing: these confirmed Johnson's recollection that he heard at least one more shot fired in the living room, and matched the bullets that killed Klein.

Blood was found throughout the house: large blood pools were discovered in the kitchen and in the bedroom doorway; there was a concentration of blood at the end of the couch where Klein's head had been resting; there was blood spatter in the bedroom and near the couch in the living room; and there were blood drops throughout the house. The detectives collected a few blood samples, one from a splash of blood on the molding above the blood pool in the bedroom doorway. Because Detective Bell ascertained that the forensic evidence

sufficiently supported Johnson's story, no detailed blood or blood spatter analysis was performed at that time. The detectives, however, documented the entire crime scene with a camera and a video recorder.

Based on this evidence, the police department acquired a warrant to search the garage in which Richter had been living. The evidence found in the ensuing search further corroborated Johnson's story and directly implicated Richter in the crime. In the garage, investigators discovered (among other things) Johnson's gun safe lying haphazardly on its back, two boxes and a drawer filled with CCI Stinger .22 caliber cartridges, and a magazine loaded with live CCI Stinger cartridges. A ballistics expert studied the .22 caliber bullet recovered from Klein's body and concluded that it was an *exact match* to the CCI Stingers found in the garage. The expert also connected the spent .22 caliber casing in the living room to the magazine found in the garage: after analyzing the casing, the expert determined that it had been ejected from a High Standard Sport King handgun—the expert then examined Richter's magazine and concluded that it was a typical High Standard magazine designed specifically for a Sport King.

A warrant was issued for the arrest of Richter and Branscombe, and both were apprehended the following day. Although Richter first denied having any involvement in the crime and told the arresting officer that his truck was never at Johnson's house on the night in question, he eventually admitted that he and Branscombe had been at Johnson's house early on the morning of December 20th. He also admitted that Branscombe used a .32 caliber weapon to shoot Johnson twice and Klein once. Richter claimed, however, that he had nothing to do with the shootings—he said that he had stayed in his truck while Branscombe went into the house to return clothing belonging to Johnson's roommate. Richter asserted that he heard shots and screams in the house and entered to find Branscombe "freaked out" claiming that he had only shot Johnson and Klein after they attacked him.

Richter also confessed that he and Branscombe had taken Johnson's Cobray M-12 .380 caliber handgun with them to the Yolo overpass after the shootings, and had discarded it there along with Branscombe's .32 caliber weapon. An initial search of that area did not reveal either weapon. Detective Bell, however, did find a crisp $100 bill a few hundred yards away from the spot Richter had designated. One day later, Richter's counsel went back to the area and returned with the Cobray M-12, which he surrendered to the police.

Two additional statements implicated Richter. At the police station, Branscombe and Richter were interviewed regarding their involvement in the events in question. Both suspects were videotaped in a holding cell during a break in the interviews, and the recording revealed a statement by Branscombe implicating Richter in the crime. Branscombe asked Richter, "Did you tell them anything?," and Richter responded, "I just told them that I did not kill anyone, and da da da." Branscombe replied, "Joshua, we were going to tell them the truth." In the meantime, the police also interviewed Lauren Sullivan, Richter's girlfriend. Although she first refused to talk about the events in question, she eventually admitted that Richter had talked with her on the night of December 20th, approximately twelve or thirteen hours after the shootings. Sullivan never protested Richter's guilt at that time—instead, she told police ominously that she didn't think she should tell them about what Richter had told her. Richter's counsel knew of both statements.[1]

---

[1]Although the videotaped statements of Branscombe and Richter were never admitted into evidence, their existence was an important aspect of the case that Richter's defense counsel had to consider. The prosecutor attempted to introduce the videotaped statements at trial during his cross-examination of Richter, but Richter denied ever making the statements. Because the defense successfully made an oral motion to exclude the videotape and transcription of its contents from trial, these statements were thus never admitted into evidence. Nevertheless, these statements, as Richter acknowledged on direct appeal, were definitely inculpatory. *See People v. Branscombe*, 72 Cal. Rptr. 2d 773, 778-79 (Cal. Ct. App. 1998), review

B

On December 23, 1994, Richter was charged with murder (under Cal. Penal Code § 187) in the first degree (Cal. Penal Code § 190.2(a)(17)), attempted murder (Cal. Penal Code §§ 187, 664), burglary (Cal. Penal Code § 459), and robbery (Cal. Penal Code § 211). The trial began almost a year later, on November 14, 1995, and lasted nineteen days. Richter and Branscombe were tried jointly—Branscombe as the primary perpetrator, and Richter as a knowing accomplice. The jury was instructed on felony murder. Thus, as long as the jury believed that Branscombe shot Johnson and Klein in the perpetration of a robbery or burglary, and that Richter was an accomplice, Richter was also liable for murder. *See generally People v. Seaton*, 28 P.3d 175 (Cal. 2001); *People v. Pulido*, 936 P.2d 1235 (Cal. 1997).

Defense counsel faced enormous evidentiary obstacles at trial. Every known piece of forensic evidence either directly supported Johnson's account of the shootings or was inconclusive. The .22 caliber CCI stinger bullets discovered in his client's garage decisively matched the bullet recovered from Klein's dead body. The $100 bill in the Yolo overpass, the positioning of Johnson's pager in the front yard, and the presence of Johnson's gun safe in his client's garage pointed strongly to his client's guilt. Moreover, his client's behavior after the shootings was hardly exemplary—Richter had fled the scene of the crime, thrown away evidence that might have implicated him in the murder, and upon arrest first denied ever being at the scene of the crime only to later recant this implausible story. There were even videotaped inculpatory statements that counsel would be forced to attempt to exclude

denied and ordered not to be officially published (Cal. 1998) (noting that Richter accused the prosecutor on appeal "of committing misconduct 'by asking appellant about a statement of his non-testifying co-defendant *which implicated appellant*.' " (emphasis added)).

from evidence. The only person who could cast doubt on his client's guilt was his client's girlfriend, who had previously told police that she had not talked with his client until approximately thirteen hours after the events in question, and thus could not credibly confirm Richter's whereabouts during the relevant time period. Finally, defense counsel knew that his client's co-defendant would not be able to testify credibly at trial—after observing Branscombe's odd behavior during an interview, counsel even suggested to Branscombe's attorney that an insanity defense might be productive.[2]

Counsel also faced significant procedural obstacles. The trial was somewhat of a hurried affair due to problems Branscombe's attorney had maintaining his bar membership. Because of past transgressions, Branscombe's attorney's bar membership was about to be suspended, and he wanted to finish the trial and collect his fee before the end of the year. Richter's counsel believed that the judge, because of this predicament, created an accelerated trial schedule that upset his plans to talk with the prosecutor and perhaps obtain a plea bargain.

Nevertheless, due to the State's perfunctory investigation of the crime scene, counsel knew that the existing forensic evidence did not necessarily prove his client's guilt beyond a reasonable doubt. Counsel knew that the homicide investigators had taken only six swabs of blood at the crime scene, had failed to do a comprehensive blood spatter analysis, and had never tested any of the blood samples they had gathered in the year prior to trial. Counsel also knew that police had never discovered the High Standard Sport King .22 caliber handgun that the ballistics analysis fingered as one of the murder weapons. Additionally, counsel knew that Johnson was not a vic-

---

[2]In light of this situation, it gravely oversimplifies the case to assume, as the majority does, that the "factual dispute [over the source of the blood pool in the bedroom doorway] was the single most critical issue in the case . . . from the standpoint of the defense," Maj. Op. at 10680.

tim likely to elicit empathy—he was a known drug dealer who had cut a deal with the State to testify against Richter in return for immunity from certain drug charges.

Understanding these limitations in the State's case, defense counsel diligently investigated evidence that could potentially exonerate his client. He hired a private investigator, James Pihl, who worked with Branscombe's attorney's private investigator, John Lee, to discover evidence not collected by the State. Counsel also interviewed a number of people who he had reason to believe might shed doubt on Johnson's story. Although this extensive investigation did not reveal much helpful evidence, counsel's investigator was able to discover that there were two bullet holes in Johnson's bedroom that were never analyzed by the police—one in a floorboard, and another in a wall. Counsel diligently notified the police investigators of the existence of these holes, which the State thereafter investigated. After examining the photographs and video of the crime scene, counsel was also able to pick out some anomalies in the State's case: for example, although Johnson claimed it was dark when he was shot, counsel noticed there was no blood on the living room light switch indicating that the wounded Johnson turned it on after being shot.

## C

In the State's opening statement, the prosecutor mentioned nothing about serological, pathological, or blood spatter evidence that corroborated Johnson's story. There was good reason for this omission: the homicide investigators had neither collected much of the blood at the crime scene (they had taken only six swabs of blood) nor analyzed it in the year prior to trial. No blood sample was obtained from the large pool of blood in the bedroom doorway. In fact, the sample that is the focus of Richter's habeas petition was removed from the door molding a few inches above that blood pool. Before trial, the State had not even taken blood from Johnson with which to compare the blood stains in the house. Accord-

ingly, the prosecutor focused on other physical evidence: the shell casings, the location of Johnson's gun safe, and the CCI Stinger cartridges found at Richter's residence.

Defense counsel's opening statement moved to exploit the State's evidentiary lapses. Counsel proclaimed that "evidence will . . . show that the subsequent investigation of the scene was quickly done and poorly orchestrated." He told the jury that "[t]he evidence of great importance is the lack of spatter marks [on the living room couch], and other pools of blood, and spatter marks found elsewhere in the house inconsistent with stories told by Gunner Johnson." Counsel explained that the crime scene photographs revealed that "there are no spatter marks of blood or anything on the couch" and that "there are also no marks on the sleeping bag [on which Klein was lying]." Counsel faulted the investigating officers for accepting Johnson's theory of the story and failing to "take swabs of the various blood marks that were everywhere in that house and the pools of blood, including a pool of blood in the bedroom near the doorway of the bedroom, to determine whose blood that was, Mr. Johnson, Mr. Klein's, or another part[y's]."

Defense counsel framed a story "very, very different" from the prosecutor's account. He told the jury that Johnson was the aggressor, that Klein assisted him, and that Branscombe shot and killed the two in self-defense. Richter's counsel admitted that Branscombe had a .32 that evening, and that he used it. But Klein had also been shot with the .22 semi-automatic pistol that was never recovered. Counsel suggested that the .22 was Johnson's: his investigator had discovered a .22-caliber-sized hole in Johnson's bedroom floor that Johnson said he had made on another occasion. Counsel again returned to the State's sloppy investigation—there were .22 casings and shells stored in Johnson's bedroom that the State never tested to see if they were connected with the bullet that killed Klein.

According to defense counsel's theory, Richter and Branscombe, who had smoked marijuana with Johnson until around 2:00 am on the morning in question, returned to Johnson's house around 4:00 am to drop off some clothing and money for one of Johnson's roommates. Richter sat in his truck while Branscombe went up to the house. Counsel asserted that Klein let Branscombe into the house, but then immediately attacked him—grabbing Branscombe in the bedroom doorway while Johnson pulled out his M-12.[3] Luckily for Branscombe, Johnson's gun was not reliable and he only got off one shot before the gun jammed. But Johnson wasn't nicknamed "Gunner" for no reason—according to defense counsel, Johnson immediately pulled out a .22 caliber semi-automatic handgun to finish the job. Fortunately again for

---

[3]Although the majority is correct that the defense's theory did not rest entirely on this admittedly "unlikely scenario," Maj. Op. at 10671 n.2, this theory was the one the defense would have preferred the jury believe. Richter's counsel was careful to give the jury multiple ways to find his client not guilty. Counsel, however, repeatedly suggested that Klein had attacked Branscombe. In his opening statement, counsel suggested that "Patrick Klein was involved in the altercation in the bedroom to the extent that he wrestled with Mr. Branscombe, and as he was wrestling with Mr. Branscombe after the first shots were fired, Gunner Johnson obtained gun number two." According to Richter's testimony, Branscombe believed that Klein was attacking him—Richter said that Branscombe had told him "that 'They tried to kill me.' " (emphasis added). Later, in his closing argument, defense counsel suggested once again that Klein was at least an agitator. He told the jury that although they did not have to believe that Klein was armed, they could believe Klein might have become "entangled" with Branscombe in such a way as to make Branscombe "think that [Klein] was an aggressor." Branscombe's attorney's closing statement made this point unambiguously: he told the jury, "I submit that there are several items of evidence in this trial that would indicate to you that *they* were trying to kill Chris Branscombe." (emphasis added). There was nothing erroneous about the defense's theory of the case in this regard. If Klein did not participate in the attack on Branscombe, Branscombe had no justification to shoot him at point blank range in the head. Of course, the defense did not require the jury to believe that Klein intended to kill Branscombe—Richter's counsel also argued that Branscombe might only have been guilty of manslaughter because Klein might simply have been caught accidentally in the middle of a shootout.

Branscombe, Johnson's talent with firearms failed to match his enthusiasm—he missed Branscombe and wounded Klein with the .22. This was just the advantage Branscombe needed. Branscombe pulled out his .32, gunned down Johnson, and then finished off Klein with a shot to the head. Richter, hearing the gunshots, ran into the house to find Klein lying in a pool of blood in the bedroom doorway, Johnson twisted unnaturally on the bed, and Branscombe, "totally freaked out," standing in Johnson's bedroom holding a smoking .32. In a panic, Richter and Branscombe fled the scene to dispose of Johnson's M-12 and Branscombe's .32 at the deserted Yolo overpass.

Defense counsel argued that none of the evidence found by the police was inconsistent with Richter's story. Counsel asserted that Johnson secretly owned a .22 caliber semi-automatic handgun from which he could have shot the CCI Stinger, that Richter and Klein had just been paid for their work at a Christmas tree lot and lost the $100 bill while disposing of the guns, and most importantly that Johnson had free run of the house for at least forty minutes after the shootings and had manipulated any other evidence not consistent with Richter's story. Counsel avowed, for example, that Johnson had moved Klein from the bedroom doorway to the couch in order to make his story sound better. Finally, counsel claimed that Johnson's gun safe had been at Richter's residence for several months and that Johnson had invented this theft to implicate Richter.[4]

---

[4]Although the defense argued at trial that Johnson's gun safe had always been in Richter's residence (where Johnson had previously stored several items), and presented several witnesses testifying such, the State also called several witnesses who testified that the gun safe was at Johnson's residence during the night in question. Fingerprint evidence was inconclusive in determining its provenance: police identified only Richter's fingerprints on the safe.

## D

Counsel must have struck a nerve because the State moved quickly to shore up its case. The prosecutor, who realized for the first time that counsel would be articulating a theory of self-defense,[5] hurried to have the blood evidence analyzed to determine if it could be inconsistent with that theory. On the fourth day of trial, without prior warning, the prosecutor presented Bell, one of the homicide detectives, as an expert in blood spatter. The following day, the prosecutor for the first time obtained a blood sample from Johnson and had it compared with the six samples collected from the scene. Four days later, on the ninth day of trial, the prosecutor put Jill Spriggs, a criminalist, on the stand to testify about the results of that analysis. Defense counsel had been given notice of Spriggs's testimony only a day earlier.

The defense began presenting its case shortly thereafter. Counsel presented seven witnesses, including Richter. These witnesses focused primarily on the timing of the shooting and the location of the gun safe—they provided testimony indicating that the events in question occurred around 4:20 am, rather than 5:00 am, and argued that Johnson had been storing his gun safe at Richter's residence. Counsel did not call any expert witnesses to the stand. Although he considered doing so at certain points in the trial, counsel eventually decided that his cross-examination of the State's experts was sufficient to create reasonable doubt about the truth of Johnson's claims. The adequacy of this decision is the primary thrust of Richter's habeas petition.

## II

In determining whether counsel's tactical decisions were so

---

[5]The defense team had only settled on this strategy shortly before trial. Previously, they had debated over a voluntary intoxication or insanity defense.

erroneous as to violate Richter's constitutional right to effective assistance of counsel, we face a truly daunting standard of review. Under *Strickland*, a habeas petitioner may only prevail on a claim of ineffective assistance of counsel if he can show deficient representation "so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court in *Strickland* refused to create a monolithic standard of acceptable attorney performance—instead, it recognized that courts must "indulge a strong presumption that a counsel's conduct falls within the *wide range* of reasonable professional assistance." *Id.* at 689 (emphasis added). The Court noted that "[t]here are countless ways to provide effective assistance in any given case" and observed that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*. Thus, to find that counsel's conduct was deficient, we must override the "strong[ ] presum[ption] that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990).

Even if we are persuaded that counsel has engaged in "unprofessional errors," *Strickland* is not satisfied unless we can conclude that "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This means "that counsel's errors [must be] so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Of course, any newly introduced expert testimony might have changed the prosecution's approach at trial—but this is not enough to find prejudice under *Strickland*. *See id*. at 694 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [or] that the errors 'impaired the presentation of the defense.' "). There is prejudice only if there is a reasonable probability that, but for the errors, the *result* of the proceedings would have been different.

Overlaying this inquiry is the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(2). Because this case is an appeal from a state court decision, we cannot simply make the findings required by *Strickland* and grant the petition. Rather, we must make a further finding: that our *Strickland* conclusion is itself so clear that the contrary judgment by the state court was unreasonable. In other words, we face a "doubly deferential" standard of review, *see Knowles v. Mirzayance*, 129 S. Ct. at 1420: we may not grant Richter habeas relief unless we are convinced that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In cases like these, where no state court has explained its reasoning, we must conduct "an independent review of the record to determine whether the state court's decision was objectively unreasonable." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). "Objectively unreasonable" does not mean that we can grant the habeas petition if we merely disagree with the state court's decision, or would have decided oppositely in the first instance. *See Williams v. Taylor*, 529 U.S. 362, 409 (2003) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Nor can we decide that a state court was unreasonable *even if* we believe it committed a clear error. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Rather, to overturn the state court's decision, its judgment about counsel's performance must be so egregious that we cannot but be convinced that the court's decision is itself outside the bounds of reasonableness.

Deference under AEDPA is especially important in this case, where Richter's claims arise under *Strickland*. The Supreme Court has emphasized that "evaluating whether a rule application was unreasonable [under AEDPA] requires considering the rule's specificity." *Yarborough v. Alvaredo*,

541 U.S. 652, 664 (2004). "The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Id. Strickland* is a general rule, as the Supreme Court has often recognized. *See*, *e.g.*, *Mirzayance*, 129 S. Ct. at 1420. The Court has made plain that "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

The majority recites these standards, but doesn't take them to heart. The majority glosses over the circumstances in which defense counsel found himself: all the forensic evidence discovered before trial implicated his client in the crime; his client's actions in response to the crime were indicative of guilt; he was fighting a judge and fellow defense attorney who wanted to finish the trial as quickly as possible; and he was surprised by expert witness testimony from witnesses the State had not previously identified. The majority also ignores the nature of the expert testimony at issue: despite the bombastic language of Richter's newfound experts, the content of their testimony is not as revealing as Richter claims.

A careful review of the record demonstrates the inadequacy of the majority's conclusions. Richter's counsel vigorously pursued the strategy he had developed in his opening statement and diligently contested all critical evidence raised by the prosecution. In no sense, then, can we conclude that "counsel was not functioning as the 'counsel' guaranteed [Richter] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Even if we could conclude, with the benefit of hindsight, that defense counsel made certain mistakes in his representation of Richter, these mistakes are not the type of egregious errors that mandate a finding of deficient performance. At worst, counsel exhibited questionable judgment by relying exclusively on his own powers of cross-examination in lieu of an expert's direct testimony. And even if counsel's judgment was flawed, it is far from clear that counsel's decision not to call these experts resulted in an unreliable guilty verdict.

Although the expert declarations offered in support of Richter's habeas petition might have added some new tools to the defense's arsenal, they can hardly dent the clear, unchallenged evidence implicating Richter in Klein's murder and the utter lack of evidence (even in Richter's newfound expert testimony) confirming or even strongly supporting Richter's theory of self-defense.

Finally, even if we could conclude, as a matter of first impression, that defense counsel failed to meet the standard of professional conduct mandated by *Strickland*, there is clearly not enough evidence in the record to conclude that a state court adjudicating oppositely has made not just an erroneous but a patently *unreasonable* decision. To rule otherwise is to ignore the clear congressional intent in AEDPA to curtail our second-guessing of state court habeas decisions. *See Williams*, 529 U.S. at 386 (Opinion of Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.) ("[I]t seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ.").

A

The majority first claims that defense counsel's decision not to consult with or call as a witness a serologist was deficient and probably prejudiced Richter's defense. In its haste to paint with broad brush strokes, the majority decides this without even a cursory discussion of the circumstances of that decision or the nature of the relevant evidence. Review of counsel's decision and the serology evidence in context indicates that counsel's decision not to "investigate" serology evidence before trial was reasonable and consistent with his trial strategy. Moreover, even if counsel's failure to procure a serologist constituted deficient performance, it had a nearly negligible effect on the course of trial.

The State had to plug the holes Richter's counsel identified in its case. It had neglected to test the blood pool in the doorway to Johnson's bedroom to see whether it was Johnson's blood (as the State contended[6]) or Klein's blood (as the defense claimed at trial[7]). The only sample the State had was a swab taken from the wall just above the blood pool. At trial, the State's expert, Jill Spriggs, testified regarding her comparative analysis of Johnson's blood sample and the swabbed sample. Because both Johnson and Klein had Type O blood, their blood samples had to be differentiated by reference to an enzyme, phosphoglucomutase ("PGM"). Spriggs opined that her laboratory testing determined that Johnson's PGM subtype was 2+1+ and that Klein's PGM subtype was 1+. Spriggs claimed that because the blood found on the molding near the blood pool had a PGM subtype of 2+1+, Klein could reliably be excluded as the donor of that blood.

This was the first defense counsel had heard of this evidence. In fact, counsel had learned of the subject matter of Spriggs's testimony only the day before her appearance in court. Spriggs had not been on the prosecution's witness list, and her forensic tests were run mid-trial. After learning of Spriggs's testimony, counsel immediately requested a continuance, which the trial court denied. At that point, counsel had to move quickly to counter this unexpected development. He called the public defender's office and then spent the evening in a library learning about PGM subtypes while preparing for cross-examination.

---

[6]The State's theory was essentially that Johnson created the blood pool when he stood wounded by the bedroom doorway waiting for Richter and Branscombe to drive away.

[7]Defense counsel's theory was that Klein wrestled with Branscombe at or near the bedroom doorway, that Johnson shot at the struggling Branscombe from near his bed, and that Johnson missed Branscombe and hit Klein. This fortuitous accident freed Branscombe from Klein's grip, and Branscombe then shot Klein in the head, which caused Klein to collapse in the bedroom doorway.

During cross-examination, counsel challenged Spriggs's conclusion that Klein could be reliably excluded as the source of the blood swabbed from the bedroom wall. In response to counsel's questions, Spriggs acknowledged that she had not tested for cross-contamination and that she had only been able to run one test. Counsel asked Spriggs whether she could testify to a "scientific certainty" that the sample only contained one person's blood. She answered equivocally that "it does not look like there are two people contributing to that stain."

Counsel also questioned whether a commingling of Johnson's and Klein's blood would still produce a 2+1+ sample and whether a degraded sample would reliably indicate PGM subtype at all. Spriggs, in response to this line of questions, eventually opined that if commingling between a 2+1+ sample and a 1+ sample occurred, the test would reveal a stronger 1+ result than what had occurred in this case. Counsel attempted to challenge this conclusion, questioning Spriggs about what would result if the proportion of blood contributed by the two donors was different, but he was cut off by the judge. Nevertheless, counsel was able to secure an admission from Spriggs that if Johnson and Klein's blood were combined in the sample, the PGM subtype would show a 2+1+ band, and that the test might not reveal a stronger 1+ result (indicating the presence of Klein's blood) if the sample was degraded.

Now, to support his habeas petition, Richter attaches the expert opinions of two serologists who make *nearly the same points* that counsel presented on cross-examination.[8] One expert, John Thornton, speculates that because "in the electrophoretic separation of PGM subtypes, the 1+ band in a 2+1+

---

[8]I should note that, although the majority trusts Richter's experts as authoritative, both experts filed only very short affidavits containing their preliminary views and indicating their availability to testify. Neither expert had access to the blood samples, and neither has actually testified or been tested by cross-examination.

sample appears at the same location as the 1+ band in a 1+ sample," the Spriggs finding "could not exclude the possibility that the sample contains a mixture of 2+1+ and 1+ blood." The other expert, Brian Wraxall, remarks that there is a possibility that Klein could have been a contributing source because "the relative intensity between the 2+ band and the 1+ band in the [wall] sample would depend on the proportion of Mr. Klein's blood commingled with Mr. Johnson's blood." Also, Wraxall points out that even a non-degraded sample might show a 2+1+ result of uniform intensity where Johnson's enzyme tested as a strong 2+ band and a weaker 1+ band. Wraxall had to qualify this opinion because "the 2+ band in a 2+1+ band is *usually, but not always*, equal in intensity to the 1+ band" (emphasis added) and no evidence at trial indicated whether Johnson's blood would create a stronger 2+ band.

Richter's professed experts do not challenge Spriggs's conclusion that the blood pool contained Johnson's blood. They also cannot establish that Klein's blood is in fact in the sample, or even that it is likely that Klein's blood is in the sample. At best they can only challenge the conclusion that evidence shows conclusively that the swabbed sample contained Johnson's blood only—a conclusion that Richter's counsel effectively challenged at trial during cross-examination.

1

With all due respect to our colleagues, counsel's performance was well within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In no way was Richter deprived of competent counsel in the sense that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Counsel did what he could under extremely difficult circumstances. While the majority excoriates defense counsel for failing to "consult" with a serologist or other forensic expert

in preparation for trial, it fails to acknowledge that the results of such "consultation" are pure speculation and have no basis in the record. Although the Certificate of Appealability in this case listed "[w]hether trial counsel rendered ineffective assistance in violation of the Sixth Amendment by failing to investigate, develop, and present [expert testimony]" as one of the issues to be considered on appeal, both the habeas petition filed in the district court and the evidence presented in support of that petition focus entirely on counsel's "fail[ure] to *present* readily available expert testimony which directly supported his theory of the case." (emphasis added). The expert witness declarations proffered in support of the petition do not indicate that any of Richter's new experts would have been available to advise counsel about his trial strategy. In each declaration, the expert only avers that he "would have been available to testify to this *if called as a witness* at Mr. Richter's trial." (emphasis added). Not one expert declaration asserts a witness's availability *before* trial to "consult" with defense counsel.

More importantly, nothing in the record hints that defense counsel would have been better prepared to address serology testimony at trial had he retained a serologist at the outset. Both of Richter's serology declarations are *reactive*—they respond to specific points made by the State's expert during trial. Neither declaration details any type of advice the serologists would have given defense counsel *before* trial, when neither counsel *nor anyone else* knew that the State would be presenting expert testimony on blood evidence.[9] Indeed,

---

[9]The record shows that it was not "entirely predictable" that "[t]he State would present forensic testimony" on serology or any other type of blood evidence, Maj. Op. at 10688 n.10. Indeed, even the State did not expect to introduce such testimony before defense counsel's opening statement, and had to scramble to collect the evidence during trial. At that juncture, the State didn't even know whether it had usable blood samples.

On this point the majority apparently "agree[s] with the dissent that counsel's decision not to ask the prosecution to *test* the blood sample . . .

before trial neither counsel nor the State knew if the State's limited blood evidence was still viable—it had been collected over a year in advance and may not have been well preserved. Thus, prior to trial, a serologist could have given defense counsel only general background knowledge about serology: no serologist could have "prepared" defense counsel to address the specific weaknesses in the State's case, which only were revealed *after* Spriggs's testimony.

Likewise, it is absurd to suggest, as the majority does, that counsel would have altered his trial strategy after consulting with a serologist before trial. Counsel had good reasons to refrain from having the State's blood samples tested, and these reasons would not have been challenged by an advisory serologist. Counsel knew that a major weakness in the State's case was the lack of serological evidence eliminating Klein as a potential source of blood pools in the bedroom and the bedroom doorway, and he knew that the homicide detectives had never taken a sample directly from the blood pool in the bedroom doorway or tested the blood samples they did possess. Given these circumstances, counsel had two options before trial: he could ask the State to do a comparative analysis of the blood samples, or he could wait and see whether the State planned on testing the samples itself. An analysis of the possible outcomes of each strategy demonstrates that counsel's decision to wait on the State's investigation was actually quite shrewd.

---

was not unreasonable." Maj. Op. at 10685 n.9. If so, the majority has created a duty to consult with experts that counsel did not intend to call as witnesses. Retaining a serologist before trial would only have "prepared" counsel by preventing him from having to search for an expert on short notice: but if this failure to prepare is constitutionally deficient, the first prong of *Strickland* becomes a nullity—no counsel can possibly retain an expert to respond to every single potential expert a prosecutor might muster.

If counsel had "investigated" and asked the State to test the blood samples, he very well could have (and in this case would have) aided the State in producing inculpatory evidence against his client. There were only three potential outcomes to a serology test, and only one of them would have been helpful to his client. If the test showed that the blood sample matched Johnson's blood, counsel's self-defense theory would have collapsed. If the test showed a match with Klein's blood, counsel's case would have been strengthened. Finally, if the test was inconclusive, counsel was no better off than he would have been had the test never been attempted. All the evidence counsel had at the time indicated that it was highly unlikely that a test would result in the second outcome. Not one piece of forensic evidence discovered at the crime scene corroborated counsel's self-defense theory, and counsel had no reason to think that the blood evidence would be any different—in fact, counsel knew that Richter and Branscombe had made videotaped inculpatory statements while in police custody.[10]

Given the low probability that a serology test would aid his client, and the high probability that it might foreclose entirely his theory of self-defense, it was quite reasonable for counsel to forgo such testing and force the State to analyze the blood on its own initiative. In this way, counsel would gain the same benefits of a positive test and yet also retain more maneuver-

[10]The Supreme Court has emphasized that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. The Court has noted that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigative decisions." *Id.* Although in this case such conversations are privileged, the circumstances of the case are such that counsel could have reasonably believed his client was involved in the shootings and that they were not in self-defense. Thus, we cannot simply assume, as the majority implicitly does, that counsel should act as he would if he believed his client was not involved in the shootings—we must recognize that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.*

ability at trial. If the State didn't bother to test the blood, or found that the samples were too degraded to create a conclusive result, counsel could ridicule the State for its inadequate investigatory processes and imply that other forensic evidence at the scene was not conclusive. Moreover, if the State decided independently to test the blood samples and found potentially exculpatory evidence, it would be required by law to disclose the result to defense counsel. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Of course, the State might test the blood and find an adverse result—but in that case defense counsel would be no worse off than were he to have requested the test himself.

To be sure, counsel's decision to rely on the State's failure to present expert evidence was in some aspects riskier than the majority's preferred strategy. If the blood evidence was exculpatory, his decision not to test the samples could have prevented the jury from having such evidence to consider. But the existence of this remote possibility is no reason to deride counsel's decision as unreasonable. Counsel, who could talk frankly with his client and discuss whether "pursuing certain investigations would be fruitless and even harmful," knew more about the risks involved with either strategy than any judges on this court. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). Thus, at best the majority can claim that counsel's decision to wait for the State's blood analysis was riskier than its preferred strategy—and the Constitution, unlike the majority, does not mandate risk-averse representation. *See id.* at 689 ("Any such set of rules [restricting the range of legitimate decisions regarding how best to present a criminal defense] would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

Counsel's actions during trial, in response to the State's expert testimony, were also quite reasonable. Although counsel might have retained a standby serologist to "consult" with during trial (as the majority strangely holds was obligatory), he had a list of the State's witnesses and knew the State was not putting on any evidence about the blood pool. After learning that the State was adding a witness, counsel first sought a continuance. When the court refused, he spent time researching the subject matter to determine the evidence's strengths and weaknesses. Even with his limited research, counsel's questions on cross-examination were thoughtful, informed, and probing. There is no evidence of inadequate preparation or other professional misconduct in his cross-examination. Counsel realized that he was not as competent as a hypothetical expert to examine the serology evidence, and prepared a list of potential expert witnesses to contact. After his cross-examination of Spriggs, however, counsel believed that he had created the possibility of reasonable doubt so as to preclude the necessity of tracking down his own expert witness (who he had no reason to believe at the time would interpret the serology evidence any differently than the State's expert[11]).

In hindsight, the decision not to obtain a serologist even at this late stage in the trial might have been a tactical error. The prosecutor ridiculed counsel's decision in his closing argument, proclaiming, "I am not going to worry about Jill Spriggs because, hey, her seven years as a biochemist and a criminalist . . . doesn't mean anything, because I am a lawyer . . . . But I am not going to pay and bring in an expert to show you." Also, counsel missed two potential weaknesses in Spriggs's testimony—he failed to question her sufficiently about whether a sample containing different proportions of

---

[11]As previously discussed, counsel had good reason to believe that his client was involved in the shootings. He had no reason to believe that further investigation into the serology evidence would reveal exculpatory information.

Johnson and Klein's blood could produce a 2+1+ result without a stronger 1+ band, and did not raise the possibility that Johnson's blood might naturally produce a stronger 2+ band and a weaker 1+ band such that a combination of Johnson and Klein's blood would create a uniform 2+1+ result.[12]

Such errors may be obvious to us, but only because we know to a "scientific certainty" that Richter's defense failed. Counsel had no such commodious perspective on his case. And the standard by which the majority is judging counsel in this case is so demanding that in the future no counsel, having failed to defend his client successfully in a contested trial, will be immune from our withering scrutiny.

We have previously acknowledged that the failure to call an expert does not always constitute deficient performance for purposes of *Strickland*. In *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008), we recognized that "it may not be necessary in every instance to consult with or present the testimony of an expert." 528 F.3d 1222, 1235. We concluded there that because the serology evidence was "pivotal" and because counsel clearly demonstrated a lack of expertise in serology, it was deficient for him to fail to consult with an serology expert and to rest on his cross examination of the State's expert. Counsel in this case, however, behaved far more responsibly than counsel in *Duncan*. In *Duncan*, counsel "demonstrated his lack of expertise in serology at the outset of his cross-examination of the State's serology expert when he told him, 'You lost me.' " *Id.* Indeed, counsel in that case "did not even know what serology was," and began questioning the State's serologist about *hair* evidence. *Id.* at 1235-36.

---

[12]It is important to note that although it is possible that Johnson's blood might naturally produce a stronger 2+ band and a weaker 1+ band, none of Richter's professed experts can confirm this hypothesis. Thus, although Richter's experts raise more hypothetical situations than did counsel on cross-examination in which a combination of Johnson and Klein's blood would create Spriggs's result, they are still merely hypothetical and have no basis in the actual facts of the case.

Here, unlike in *Duncan*, counsel was inexperienced with blood analyses but not uninformed. He spent an entire evening studying the topic before his cross-examination and asked probing and relevant questions of the State's expert. After his cross-examination of the State's expert, counsel made an informed decision that a serology expert would not add significantly to his case, which from the outset focused on holes in the State's investigation. Even nearly fourteen years after the trial, during his deposition in this case, counsel was able to talk intelligently about the serology evidence and its flaws. Moreover, the experts procured by Richter in support of his habeas petition make the same type of objections to the State's expert testimony that counsel made on cross-examination—all deal with hypothetical situations in which a 2+1+ result might not conclusively exclude Klein as a potential donor to the blood sample.

Also, unlike in *Duncan*, we are not engaged in *de novo* review of the state court's decision. *Duncan* arose under the pre-AEDPA regime, thus, there we "review[ed] the district court's decision to deny habeas relief," and petitioner's "ineffective assistance of counsel claims," *de novo*. 528 F.3d at 1232-33. Under AEDPA, we cannot simply compare this case to the facts of *Duncan* to determine whether to grant Richter's petition—we must determine whether the California courts' decisions about the serology evidence were *unreasonable* in light of Supreme Court holdings.

The majority stretches the general rule of *Strickland* beyond any case the Supreme Court has decided. If counsel in this case can be said to have unreasonably rendered deficient performance in failing to use a serologist at trial, almost no counsel in the future can satisfy *Strickland* without first consulting with every conceivably relevant expert before trial and then calling these experts at trial to testify on any contested forensic issue. No matter what counsel thinks about the efficiency of paying expert witness fees to duplicate his own research on a topic, he is remiss to fail to pay them. Time

pressure, financial pressure, trial strategy—it doesn't matter: the majority essentially rules, "even when not in doubt, call an expert."[13]

2

Although defense counsel did not perform deficiently in deciding not to call an expert—to, as counsel put it, "sprinkle more holy water" on points made during cross-examination— even assuming deficient performance, I doubt that prejudice resulted. As the Sixth Circuit has held, "the modest difference between the jury hearing [a] theory of defense through cross-examination and hearing it through the mouth of another expert" is not enough to establish prejudice under *Strickland*. *Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005). Although perhaps an expert witness could have articulated the flaws in the prosecution's serology evidence more eloquently and provided an opportunity for the defense to bolster its theory through repetition, it is clear that more is required to find that there is a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

There is no reason to think that the defense would have been able to present better expert witness testimony at trial than the expert affidavits filed in support of Richter's habeas petition. Yet neither of these expert declarations presents significantly better objections than those articulated by defense

---

[13]The breadth of the majority's holding is truly astonishing. According to the majority, no counsel can reasonably make the decision to not call an expert to the stand *until* he has consulted with said expert and determined that the expert's testimony would not be helpful to his case. Because this reasoning simply ignores the fact that the decision to consult with an expert is a strategic decision in its own right, and that the Supreme Court has upheld the ability of counsel to make strategic judgments after reasonable investigation, *Wiggins*, 539 U.S. at 533, it promises to open the floodgates for habeas petitions in the Western United States based on the lack of expert testimony at trial.

counsel on cross-examination. Any expert testimony would have provided little new information to the jury—instead, it would have simply reinforced counsel's cross-examination, indicating that the 2+1+ result did not preclude a conclusion that the blood sample was a mixture of Johnson and Klein's blood, and therefore there was a "possibility" that Klein's blood was also in the sample. As it was, Richter's counsel argued that Spriggs did not "demonstrate actual knowledge about what really goes on in there when there is degradation, a whole year[']s worth of sample." He added, "Nor did she have particular knowledge of what happened when two kinds of bloods are combined." The majority cannot (and thus does not attempt to) explain why we should assume that the jury would have credited an expert's enunciation of that theory when it obviously rejected defense counsel's.

The majority simply misses the point when it claims that because Spriggs "adhered strongly" to her hypothesis that the blood came only from Johnson, Maj. Op. at 10704 n.21, the lack of Richter's newfound serology testimony was prejudicial. The State's expert would most certainly not have broken down on the stand and dramatically admitted error even if defense counsel had introduced directly contradictory expert testimony of his own. The question thus is not whether the expert testimony would have "cast" the State's expert testimony "into doubt," Maj. Op. at 10705—defense counsel's cross examination did that. The question is whether the expert testimony would have added appreciably to the defense's attempts to undermine the State's expert. Besides noting that the testimony came from an expert, rather than a lawyer, the majority has not put forward any evidence to support its answer of this question in the affirmative.

Moreover, the expert testimony at issue, even if introduced at trial, is not conclusive enough to significantly weaken the prosecution's theory. The proffered testimony says only that it is *possible* that the blood sample was a mixture of the two victims' blood—it does not indicate the probability that such

a mixture would create the laboratory result in this case. At best, the declarations contest Spriggs's conclusion that the blood sample was exclusively Johnson's. The declarations are carefully worded to say that Spriggs's results *cannot exclude* Klein as an additional source of the blood pool. The declarations do not support the theory the defense would have liked to have shown: that Klein was the source of the blood pool. For that conclusion, the PGM subtype of the blood sample would have had to have been a 1+, and it was not. Thus, the totality of the serology evidence strongly supports the State's theory, that the blood pool was Johnson's. All that Richter can claim is that there is a *possibility* that the blood pool contained both Johnson's and Klein's blood.

Unfortunately for Richter, neither expert cites any evidence to support a conclusion that these theoretical *possibilities* are at all *probable* in this case. As the panel found, "[b]ecause these expert reports do not foreclose the likelihood that the blood from the blood sample came exclusively from Johnson, they do not impeach Johnson's testimony that the blood came from him alone." *Richter v. Hickman*, 521 F.3d 1222, 1231 (9th Cir. 2008). Especially given the significant amount of other forensic evidence supporting the prosecution's theory, and the general implausibility of Richter's story, *see infra* Part II.D, it is absurd to assume that evidence about the "possibility" of blood mixing would have convinced the jury that Richter's recollection of the events of December 20th was nearly as compelling as Johnson's.

3

Once we put the AEDPA overlay on top of *Strickland*, our task becomes even easier. Even if I am wrong, and counsel's performance was both objectively deficient and prejudicial, the matter is surely open to debate and discussion. If so, the California courts were not *unreasonable* to reject Richter's claims of ineffective assistance of counsel. Nothing in *Strickland* or any other decision of the Supreme Court should have

alerted the California courts that they were making a colossal error in judgment, one on which reasonable jurists could not disagree. *See Mirzayance*, 129 S. Ct. at 1420.

B

For similar reasons, defense counsel's decision not to consult a forensic pathologist was clearly not prejudicial. Richter's habeas petition contains the declaration of a pathologist, Dr. Paul Herrmann, who would have been able to testify that the prosecution's theory about the creation of the blood pool in the bedroom doorway was "scientifically unreliable." The majority asserts that this testimony, in combination with that of the other expert witnesses, would have seriously undermined the State's case. A closer investigation of the pathologist's hypothetical testimony, however, reveals the fallacy of this conclusion. Indeed, much of the pathologist's testimony is pure speculation not based on his specialized knowledge or experience and could have been excluded at trial for that reason; his only "expert" analysis does not preclude the State's theory; and all of his observations merely parrot defense counsel's statements at trial.

Many of the assertions in Herrmann's declaration could have been properly excluded by the trial court as having no evidentiary value. *See People v. Richardson*, 183 P.3d 1146, 1179 (Cal. 2008). Herrmann opines that because nothing in Johnson's testimony indicates that he was standing in the bedroom doorway for an amount of time necessary to create a pool of blood of the necessary magnitude, the prosecution's theory to the contrary is unreliable. Additionally, Herrman concludes that the treating physician's testimony about Johnson's shoulder wound "does not support the State's theory because the amount of blood likely to result from such a wound would have been minimal." Notably, Herrmann does not specify the scientific basis for either of these bare conclusions. He does not even assert that these conclusions are based on his experience or specialized knowledge of forensic

pathology. California courts have excluded expert opinions for these very failings. *See*, *e.g.*, *Jennings v. Palomar Pomerado Health Sys., Inc.*, 8 Cal. Rptr. 3d 363, 369 (Cal. Ct. App. 2003) ("[A]n expert's conclusory opinion that something did occur, when unaccompanied by a reasoned explanation illuminating how the expert employed his or her superior knowledge and training to connect the facts with the ultimate conclusion, does not assist the jury.").

Likewise, the only opinions in the pathologist's declaration based on his "experience" are too speculative to be admissible. Although Herrmann admits that he had access to photographs of Johnson's wounds, he does not base his conclusions on this evidence, but on testimony offered at trial, which he did not attend. Moreover, he gets a number of material facts wrong. Herrmann claims that the investigating officer did not notice that Johnson was injured until a few minutes after arriving at the crime scene and opines that "[g]iven my experience, if Mr. Johnson had been bleeding so profusely as to have deposited the pool of blood on the floor between the living room and the bedroom, it is unlikely that Detective Wright would have been oblivious to the injury." In offering this opinion, he ignores Detective Wright's testimony that Johnson was soaked in blood when he arrived at the house: Johnson had "blood on both cheeks, blood covering his shirt, and blood on his hands, and . . . on his right shoulder." He also fails to account for photographic evidence that Johnson bled enough to create a significant blood pool in the kitchen during the few minutes he talked with the detectives. Finally, Herrmann's declaration ignores Detective Wright's testimony indicating that one reason the detective did not believe Johnson was injured was because Johnson originally claimed that he was not hurt. *See Richardson*, 183 P.3d at 1179 ("[An] expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors." (internal quotation marks and alterations omitted)).

Even if by some serendipitous occurrence these conclusory and speculative assertions were not summarily excluded by the trial court,[14] they are too weak to significantly contradict the State's theory. Herrmann's declaration is careful to conclude that the State's theory is "unlikely"—not that it is impossible. In fact, it was not only possible that Johnson bled enough to create a pool of blood in the doorway, but consistent with other evidence admitted at trial. Photos taken of the crime scene several hours later established that there was a sizable blood pool in the kitchen area created by Johnson while he talked with Detective Wright in the few minutes before the ambulance arrived—a fact that the prosecutor hammered home in his closing statement.

More importantly, the pathologist's hypothetical testimony is simply a repetition of the defense's overarching theory, echoed by defense counsel throughout trial, that Johnson was shot around 4:20 am rather than 5:00 am and otherwise could not have had time to dispose of his marijuana plants and create blood trails throughout the house. For example, during his cross-examination of Detective Wright, defense counsel pressed, "And it wasn't until after you had located [Johnson] in the kitchen area that you first entertained a belief that he

_____

[14]The majority's assertion that such an objection to the prejudicial effect of the expert declarations was waived before the district court, *see* Maj. Op. at 10697 n.15 & 10705-06 n.23, is based on a misreading of the parties' stipulations. In support of his habeas petition before the district court, Richter submitted declarations for his experts in lieu of direct testimony, and the parties stipulated that "the previously submitted declarations of petitioners' expert witnesses are admissible for consideration on the merits, and that [the experts], if called to testify, would testify in accordance with their declarations." In contrast to the majority's assertion, this stipulation narrowly waives only an objection to the admissibility of the declarations *in the district court* in lieu of direct testimony for the purposes of considering Richter's habeas petition. It does not clearly waive any objection to the *prejudicial effect* of the content of the declarations based on their admissibility in *state court* at trial. Indeed, determining the admissibility of Richter's expert declarations at trial is one aspect of a "consideration [of the testimony] on the merits."

had, in fact, suffered a wound; is that right?" The jury had full knowledge of the defense's theory and could do with it what it pleased. The majority proffers no reason that having a pathologist repeat what defense counsel harped on during trial would be at all consequential to the jury's decisionmaking—especially when the pathologist's opinion is not supported by any explicit medical or scientific basis and could have been excluded for that reason.

The majority thus illogically concludes that defense counsel rendered ineffective assistance by failing to consult with and call to the stand an expert whose testimony would have been redundant, utterly unpersuasive, discredited by readily available forensic evidence, and most likely *inadmissable*. Indeed, it concludes that a state court adjudicating otherwise has been unreasonable. This is beyond overreaching.

## C

What the majority calls the "most damaging" aspect of counsel's performance, his decision not to consult with a blood spatter expert, is actually the most understandable. Counsel had good reason for failing to consult with a blood spatter expert—he learned only minutes before the State's blood spatter expert's testimony that anyone would be opining on such matters. Moreover, counsel's failure to consult with a blood spatter expert was far less damaging than the majority admits. For these reasons, even if counsel was not flawless in his approach to the blood spatter testimony, his performance did not rise to the level of unconstitutional deficiency, and in any event, the testimony he could have elicited through his own expert would not have contradicted the State's case.

## 1

Before trial, counsel had no reason to know that an expert in bloodstain pattern interpretation would be helpful to his defense. Indeed, in his deposition he clearly confirmed that

although he considered consulting a serologist before trial, he did not even consider consulting a blood spatter expert until after the State's expert had testified. Counsel's approach was not unreasonable.[15]

Counsel was not put on notice by the pre-trial actions of the prosecutor that such an expert would be necessary. Bell, the homicide detective who would testify about blood spatter for the prosecution, was not denominated as an expert on the subject prior to trial. Counsel never received a report from the prosecutor prior to Detective Bell's testimony giving the basis for his testimony, outlining the subject matter of his testimony, or providing any indication of his expertise in blood-stain pattern interpretation. When counsel—quite responsibly—asked the court for a report prior to Detective Bell's testimony concerning its subject matter, the judge flatly refused.

Counsel's opening statement neither revealed counsel's knowledge of the importance of expert blood spatter testimony nor promised the jury that he would call a blood spatter expert. Although counsel did, in his opening statement, advise the jury of the significance of blood spatter evidence, he also

---

[15]Contrary to the majority's assertions, the Sixth Amendment does not require defense counsel to "consult" with any and every potentially helpful expert in preparation for trial. Instead, *Strickland* makes clear that only an "unreasonable" investigation is constitutionally deficient. 466 U.S. at 690-91 ("Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). The Supreme Court has never suggested, as the majority does, that anything less than a "scorched-earth" investigative strategy is constitutionally deficient. Instead, the Court has long recognized that counsel should have the ability to weigh the potential value of investigation with the cost of acquiring it. *See Wiggins*, 539 U.S. at 533 ("Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant."). Where counsel has no reason to believe, and should have no reason to believe, that a certain type of expert witness would be helpful to his case, it is not *unreasonable* for him to fail to "consult" with the expert either before, during, or after trial.

indicated precisely what bloodstain pattern evidence he believed supported his theory—none of which remotely required an expert to interpret. Counsel noted in his opening statement that "[t]he evidence of great importance is the *lack* of spatter marks in this area, and [the lack] of other pools of blood, and spatter marks found elsewhere in the house inconsistent with stories told by Gunner Johnson." (emphasis added). He explained further that photographs of the crime scene would show that "there are no spatter marks of blood or anything on the couch;" that there were no blood marks on the sleeping bag on which Klein was purportedly sleeping; that there was a large pool of blood in the bedroom doorway that was never analyzed by the police; and that although Johnson claimed that he turned the lights on after being shot by Branscombe, there was no blood on the light switch. Not only did counsel elicit testimony establishing each one of these propositions during the course of the trial, he reiterated their significance in his closing statement.

Thus, because counsel was hardly remiss for failing to call a blood spatter expert to testify about the significance of the *absence* of blood spatters or pools of blood in certain areas of the house, the only possible "promise" counsel failed to honor was his pronouncement that the pool of blood (not blood *spatters*) in the bedroom doorway was "inconsistent with stories told by Gunner Johnson." But, as counsel testified in his deposition, he had no reason to know before trial that the *absence* of small blood spatters surrounding this pool of blood would be significant in determining its source. Indeed, although there were "spatters" surrounding the pool that might ordinarily have alerted experienced counsel to the importance of a bloodstain analysis, these spatters were in this case created by a "foot stomp"—some unknown person had stepped into the middle of the blood pool and splashed portions of it on the bedroom wall and door. This was not enough to alert an attorney of counsel's experience to the importance of a blood spatter expert before trial.

During trial, counsel diligently responded to the prosecution's expert's testimony. He first objected to the testimony and asked that it be excluded, claiming that it was proffered too late. He also asked for a preliminary facts hearing and for a copy of Detective Bell's qualifications regarding blood spatter, but the court denied both requests. Although counsel does not remember asking for a continuance, it is highly unlikely, given the tenor of the trial and counsel's other experience with such requests, that one would have been granted.

Once the prosecution's expert, Detective Bell, had testified, counsel "considered [exploring] testimony relating [to] atomized blood droppings in the area of Mr. Klein's head on the couch relating also to whether or not this could have been caused by a sneezing, coughing, choking of the person on the telephone that was somewhat adjacent thereto." He also considered whether it was necessary to call an expert to testify concerning the various blood spatters in Johnson's bedroom. In both cases, he waited until after his cross-examination of the prosecution's expert, and then determined that neither expert would be profitable to his defense. This judgment appears to have been correct—Richter has failed to obtain in support of his petition a single expert who would contradict Detective Bell's opinion about the origin of these spatter marks, or who would indicate that defense counsel's theory about the origin of these spatter marks is even "possible."

Even after Detective Bell's blood spatter testimony, counsel had no reason to know that an expert would be helpful to determine whether the blood pool in the bedroom doorway came from Klein or Johnson. Detective Bell did not testify *at all* about blood spatter surrounding the pool—he testified about blood patterns and spatter on Klein's body and in other areas of the crime scene. Counsel might have been alerted to the fact that a blood spatter expert might have been helpful *in general*, but he had no reason to believe that blood spatter testimony would definitively indicate that either Klein or Johnson created the blood pool. Indeed, counsel had good reason

to believe that a blood spatter expert would not be able to confirm his client's story—all the evidence so far presented at trial (and generally known to counsel) suggested that pursuing such an investigation would be fruitless. *See supra* Part II.A at n.7.

In sum, although counsel's response to the blood spatter expert's testimony was unlike his more reasonable response to the serologist's testimony—he did not independently research bloodstain pattern science nor know enough about the subject to evaluate whether his cross-examination of the State's expert was sufficiently effective—it was not so egregious to constitute ineffective assistance of counsel. By the time the blood spatter expert had testified, the trial was well underway. Counsel had to weigh the potential value of such an expert with the cost of acquiring one mid-trial. Taking time out of his trial preparation to find and retain a blood spatter expert who he had no reason to believe would disagree with the State's expert or be able to opine on the source of the blood pool is not plainly an error in judgment. Even if, with the benefit of hindsight, it was not a prudent decision, it was certainly not constitutionally deficient. At the very least, it was reasonable for California courts to consider counsel's choice not deficient.

2

Even if counsel made the wrong call, in light of the existing forensic evidence and the implausibility of Richter's story it is far from clear that Richter was prejudiced. The majority confidently proclaims that the testimony of Richter's new-found blood spatter expert, Ken Moses, would have created reasonable doubt as to Richter's complicity in Klein's murder. But this proclamation ignores the unchallenged blood spatter evidence at trial that directly undermined the defense's entire case.

Specifically, Detective Bell opined that *several* important aspects of the blood evidence found at the scene were consis-

tent with Johnson's recollection that Klein was shot at or around the living room couch rather than in the bedroom doorway. First, the blood flow patterns on Klein's face indicated that he was probably not moved "up or down" after he was shot in his left eye. More specifically, the blood from Klein's left eye wound emanated from his ocular cavity and flowed only down the left side of his face. If Klein had been moved from a different position, his head could not have been leaned (even slightly) back or forward during this movement, or otherwise the blood would have flowed down toward his chin or up toward his hairline. Second, a small area of high velocity blood spatter (spatter created by an impact of tremendous force) was visible beside the living room couch. Bell opined that because he was unaware of any other action besides a gunshot wound that could have created such high velocity spatter, either Klein or another unknown person had to have been shot on or slightly above the couch. Finally, Bell testified that because the blood pool in the doorway was "pristine" and did not exhibit any "smearing" of blood, a person shot there would have had to be "lifted straight up" from the pool, which was unlikely. Richter's newfound expert fails to contradict *any* of these propositions. *See* Maj. Op. at 10702 n.18 ("The most damaging evidence at trial was Detective Bell's blood spatter evidence.")

Thus, for the forensic evidence to be consistent with Richter's story, the drug-addled, intoxicated, 5'10", 155 pound Johnson would have had to perform an athletic feat of nearly Olympic proportions to move Klein from the bedroom doorway to the couch.[16] According to Detective Bell's testimony, Johnson would have had to lift the 6'1", 166 pound Klein "like a baby in [his] arms with [his] head parallel with the axis of [his] body" and carry him in *precisely* this position across the room, over a coffee table, and onto the couch. Johnson

---

[16]Johnson was not only seriously wounded, but somewhat intoxicated (his blood alcohol level was 0.024) and probably under the influence of marijuana.

could not have dragged Klein even a short ways from the blood pool—he had to lift him "straight up."

More importantly, for the forensic evidence to be consistent with Richter's story, some other person would have had to have been shot at or near the couch—a proposition that is entirely inconsistent with both Richter's recollection of the events in question and the evidence presented at trial. Richter did not testify that he saw a third wounded person on or near the couch. No additional shell casings were discovered in the living room that did not correspond to either Johnson's or Klein's wounds. Neither the State nor defense counsel offered any witnesses who claimed that another unknown person was in the house on the morning of December 20th. After fifteen years, no witnesses have materialized either to admit to being in Johnson's residence during the night in question or to report on a newly disinterred corpse with at least one bullet wound.

Given the utter lack of evidence indicating that a third person was shot at Johnson's residence, the totality of the State's and Richter's blood spatter testimony leads to only one possibility: Klein was shot on or near the couch. This scenario is entirely inconsistent with Richter's story, which required Johnson to shoot the struggling Branscombe and Klein from a position near his bed.[17] *See* Maj. Op. at 10698 ("If Klein was killed while lying on the couch in the living room, there was no possibility that Richter's account was correct.").

Although Richter's newfound expert testimony opining about the lack of small satellite spatters in the area of the doorway blood pool may have weakened Johnson's already

_____

[17]The uncontradicted testimony of a ballistics expert indicated that Klein was shot with the .22 caliber bullet from between 11 and 22 inches away. Because Johnson's bedroom was more than 22 inches away from the couch, Johnson could only have shot the .22 caliber bullet that wounded Klein if Klein was shot in the bedroom doorway.

scattered account of the shootings, it would not have been enough to render plausible Richter's contrary account. Richter's blood spatter expert opines that "the blood pattern [in the bedroom doorway] was caused by the pooling of blood from a source close to or lying on the floor." This opinion is not inconsistent with the theory that the blood pool came from Johnson—instead, it means only that the blood couldn't have originated from Johnson while he was standing up.

Richter, even after several years of foraging for expert testimony to reinforce his theory, has been unable to discover a single expert to contradict Detective Bell's testimony that someone had to be shot within a few feet of the couch. At trial, defense counsel argued that the high velocity blood spatter near the couch was created when Johnson sneezed or coughed blood while talking on the nearby phone. Not surprisingly, Richter's habeas petition lacks any expert declaration confirming this assertion that Johnson could cough blood with the force of a semi-automatic. Likewise, although the majority takes it upon itself to discredit Detective Bell's testimony concerning Johnson's movement of Klein, Richter has not produced any expert testimony disputing Detective Bell's conclusions in this regard.

In sum, unlike Richter's blood spatter testimony, which only contradicts Johnson's recollection of the events, the State's blood spatter testimony contradicts the defense's entire case because it establishes that Johnson could not have physically shot Klein. The State's blood spatter testimony has never been challenged—even Richter's new blood spatter expert cannot contradict the State's blood spatter evidence.[18]

[18]Because Richter did not present any blood spatter evidence in his habeas petition that if presented at trial would have directly contradicted the State's expert, we cannot assume, as the majority does, that the jury would have been forced to choose between the experts, *see* Maj. Op. at 10699-10700 n.16. Instead, we must consider whether the totality of the non-contradictory blood spatter evidence would have created reasonable doubt of Richter's guilt.

Because the State's case was not predicated on the fact that Johnson stood up while making the blood pool in the doorway, Richter's testimony only discredits Johnson's account of the events. In contrast, the defense's entire case was predicated on Johnson having the ability to shoot Klein with a .22 while Klein was struggling with Branscombe, and this theory is entirely discredited by the State's blood spatter testimony.

Because of the unchallenged forensic evidence directly contradicting Richter's entire case, it was thus likely correct, and certainly not unreasonable, for a state court to assume that no prejudice resulted from defense counsel's failure to obtain the expert blood spatter testimony.

D

As the majority recognizes, *Strickland* requires us to "consider the totality of the evidence before the judge or jury" when making a prejudice determination, 466 U.S. at 695. But this inquiry does not merely encompass the evidence claimed by the habeas petitioner to be infected with error—it also should include a consideration of "factual findings . . . unaffected by the errors." *Id.* We must thus "[t]ak[e] the unaffected findings as a given" and ask, "taking due account of the effect of the errors on the remaining findings," whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696. The Supreme Court cautioned in *Strickland* that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* In this case, the State's case was solid, but not overwhelming. The unaffected factual evidence before the jury, however, provides substantial support for its guilty verdict. Indeed, Richter and Branscombe's story not only has so many holes that it is unbelievable, but uncontradicted expert testimony about the forensic evidence found at the crime scene further implicates the duo. Certainly, given these implausibilities and forensic

evidence, we cannot say that a California court finding that Richter's hypothetical expert testimony was not prejudicial was unreasonable in so doing.

In order to believe Richter and Branscombe's story, the jury first had to assume that Johnson was simultaneously savvy and stupid. The jury had to believe that Johnson was intelligent enough to do the following things after being shot in the shoulder and head by Branscombe: (1) take the .22 caliber semi-automatic handgun (that only Richter claimed Johnson owned) and bury it where no subsequent investigation would unveil it; (2) move the .22 caliber casing from his bedroom to the living room to implicate Richter in Klein's death;[19] (3) find his hip sack and any remaining CCI Stinger .22 caliber ammunition and bury it with the .22 caliber gun in order to make the scene consistent with a robbery; (4) throw his pager out his front door onto the lawn to make it look like Branscombe and Richter had taken his hip sack; and (5) lift Klein carefully from the bedroom doorway and move him to the couch to make it look like he was shot in his sleep. Despite this careful scheme, the jury also had to believe that Johnson was so stupid as to (1) move Klein, rather than leaving him exactly where he was shot, and simply tell the police that Klein was coming to Johnson's aid when he was gunned down in the bedroom doorway; (2) throw his marijuana plants and drug paraphernalia over his fence into his neighbor's yard, in plain view, instead of hiding them with the .22 handgun, the CCI Stinger ammunition, and the hip sack; (3) wait nearly forty minutes planning his story before calling the police, only to tell them three potentially inconsistent stories about what happened;[20] and (4) tell the police specifically that

---

[19]Although the State's expert testified that the location of bullet casings were not entirely indicative of the location of the shooter, he also testified that it would be highly improbable that a gun fired in the bedroom would release a casing in such a way as to bounce out the bedroom door, leap over Klein's body, and come to rest in the corner of the living room.

[20]Because the defense's theory rested on the assumption that Johnson deftly manipulated all the forensic evidence inconsistent with Richter's story, the fact that Johnson failed to complete the effort by telling a police a consistent story was a major problem for the defense, as the prosecutor repeatedly pointed out in his closing argument.

he did not ever see Richter holding a gun in his bedroom, when he had already manipulated the crime scene to implicate Richter.

To believe Richter's story, the jury also had to overcome *uncontradicted*, *unchallenged* forensic evidence corroborating Johnson's story. The prosecution's blood spatter expert testified that the blood flow patterns on Klein's face indicated that he was not shot in the bedroom doorway; there was high velocity blood spatter in the area of the couch that could only have resulted from a gunshot wound; and there was no evidence of bruising or blood spattering on Klein's face consistent with him being shot, falling, and making an impact with the bedroom floor. In short, for Richter's account of the shootings to be at all consistent with the State's uncontradicted expert testimony, the jury would have had to either *invent* a third wounded person at the crime scene whose existence was neither asserted by the parties nor suggested by the evidence at trial, or assume without any evidentiary or scientific support that Johnson coughed blood at a velocity of approximately 1000 meters per second.

Finally, to credit Richter's version of the events, the jury had to believe that several highly improbable events occurred. The jury had to believe that (1) Richter and Branscombe left Johnson's house around 2:00 am to return to their workplace at the Christmas tree lot because they suddenly felt motivated to clean up their work area; (2) Richter and Branscombe returned to Johnson's house at 4:00 am to give Johnson's roommate his pay and clothing from the Christmas tree lot, rather than waiting until the next morning; (3) upon the duo's return to Johnson's residence, Johnson and Klein were so intoxicated or drugged that they attacked Branscombe (who they had just smoked marijuana with a few hours before) for no reason;[21] (4) Klein, who had let Branscombe into John-

---

[21]The majority misunderstands the defense's theory when it claims that Johnson's intoxication can "explain why, in his befuddled state, not recog-

son's residence minutes earlier, initiated an attack on Branscombe with sufficient force that Branscombe felt justified in pulling out his .32 in self-defense; (5) Johnson, who had a perfectly good .22 caliber semi-automatic handgun, would first attempt to shoot Branscombe with his Cobray M-12, which was allegedly prone to jamming; (6) the M-12 immediately jammed after Johnson fired one shot, even though it functioned normally when tested later; (7) Johnson, a firearms enthusiast possessing the element of surprise, first fired his M-12 nearly straight into his bedroom floor, then missed hitting Branscombe with his .22 semi-automatic handgun from around twenty inches away; (8) Richter coincidentally had ammunition and a magazine at his residence that perfectly matched the .22 caliber casing found at the crime scene; (9) Richter and Branscombe ran off to the Yolo overpass to immediately dispose of the weapons even though they believed they were innocent; (10) Richter and Branscombe just happened to have several $100 bills, one of which happened to fall out while they were disposing of the guns in the Yolo overpass; (11) Richter and Branscombe avoided calling the police for a day and a half after the shootings, even though they learned shortly thereafter that the police were investigating Johnson's house; (12) Richter initially denied ever being at Johnson's house, even though he believed he was innocent; and (13) after an exhaustive search of the Yolo overpass in the area where Richter told the police the weapons had been thrown, no weapons were found, but the very next day, defense counsel returned to the overpass and found *only* Johnson's weapon, the M-12, and not the potentially incriminating

---

nizing Branscombe, he shot what appeared to be an intruder when he awoke and saw an unknown person unexpectedly in his house," Maj. Op. at 10701. It was quite important to the defense to suggest that Johnson and Klein were *not* asleep when Branscombe entered the house, so that it could be proposed that Branscombe did not enter the house without their consent. Thus, in his closing statement defense counsel proclaimed, "Christian Branscombe *did not surprise anybody*, did not go running in the dark and start shooting. It didn't happen that way." (emphasis added).

.32 that Richter and Branscombe remembered discarding in the very same spot.

Given the utter implausibility of Richter's story, and the general plausibility of Johnson's, it stretches the very meaning of prejudice to claim, as the majority does, that counsel's failure to produce expert testimony that would at best contradict the prosecution's experts and Johnson on some minor points is enough to sustain Richter's burden of proving prejudice. Even if we could conclude as a matter of first impression that, in the face of such odds, the unproduced expert opinions might have persuaded a jury that Richter could not be guilty beyond a reasonable doubt, it is condescending to conclude that California state courts adjudicating otherwise have made an unreasonable decision under AEDPA.

III

The majority today grants Richter's request for a do-over. The temptation to grant such a request is great in a contested case of "who shot whom first" when the evidence is either circumstantial or based on the eyewitness accounts of the participants. The temptation is particularly alluring when we know what trial counsel could not: that his defense is not going to work. But our post-hoc clairvoyance cannot diminish the fact that Richter's counsel presented a coherent, viable defense. The majority's perceived "deficiencies" in counsel's preparation ignore counsel's real-time dilemmas—the trial court, the prosecution, his limited resources and, most importantly, his client. We face none of those challenges. No trial will ever be perfect; no counsel complete in his preparation. Richter's counsel, even if not perfect, was diligent in his preparation and vigorous in his defense. I would conclude that there was no *Strickland* error and, *a fortiori*, no grounds for us to grant the writ under AEDPA.

I respectfully dissent.